[Criminal No. 850. Filed March 8, 1937.]

[65 Pac. (2d) 1141.]

BILLIE KINSEY, Appellant, v. STATE OF ARIZONA, Respondent.

Mr. V. L. Hash, Mr. C. H. Young, for Appellant.

Mr. Joe Conway, Attorney General, Mr. W. E. Polley, Assistant Attorney General, Mr. Harry Johnson, County Attorney, and Mr. Earl Anderson, Deputy County Attorney, for Respondent.

LOCKWOOD, J.—■ This is an appeal by Billie Kinsey, hereinafter called defendant, from a judgment and sentence pronounced upon a verdict of a jury finding her guilty of murder in the second degree. The facts of the case, taken in the strongest manner in support of the verdict, as under our oft-repeated rule we must take them, may be stated as follows:

Odessa Ball, hereinafter called deceased, was a young woman about twenty-one years of age, residing at Coolidge, Arizona. About the 21st of April, 1936,

she left her home to visit a girl friend, named Martha Jones, residing in Buckeye. She was accompanied from Coolidge to Buckeye by three of her friends, and arrived at the latter place about midnight, where she remained with her friend Miss Jones, while her companions returned to Coolidge. She stayed at the Jones house from April 21st to April 27th, when she left via an eastbound train, saying she was returning to Coolidge. During all of the time that she was at the Jones house she slept with her friend. Both the girl and her mother observed deceased closely and she appeared to be in good health and high spirits, without any indication of ailment or other injury, Miss Jones testifying that the night previous to her departure from Buckeye she was not flowing, hemorrhaging, or suffering apparently from any inward condition. Deceased arrived in Phoenix on the early morning train, Monday, April 27th, and was seen at the depot by a relative, and shortly after leaving the depot she met a friend at First Avenue and Washington Street, and then went on west on Washington Street. Both parties she met testified that at that time she appeared to be healthy and in good spirits. About 10:30 the same morning, Fay Plummer, a friend of defendant, went to the latter's house for some purpose, and was then informed by defendant that she had a patient. Miss Plummer did not at that time see the patient, but in the afternoon of the same day returned to defendant's house. On this second visit, the defendant told her that she (defendant) was going to the store, and if her patient wanted anything, she would like Miss Plummer to attend to it. While the defendant was gone, a girl whom Miss Plummer did not know at that time came into the room, walked around a little, and then went back and lay down on a bed on the sleeping porch. The girl seemed to be nervous and restless and acted

as if she was in considerable pain. About this time Miss Plummer had a conversation with the defendant, and the latter remarked that "she thought the girl was about ready to do business and that she was a hard case." Miss Plummer then left and did not see the girl again until Thursday, when she identified the body of deceased, which was at the time in a mortuary, as being the girl whom she saw at defendant's house on the 27th of April. It further appeared that between 11 and 12 o'clock P. M. on Tuesday, April 28th, Jap Kinsey, defendant's ex-husband, together with two other men, went to defendant's house and found a girl there apparently in great pain and unconscious, with the defendant working with her. These men took the girl to the Good Samaritan Hospital and placed her in the care of a nurse, where she died about thirty minutes later. They gave no information to the staff at the hospital, except that some of the girl's relatives would call later, and shortly after her death, a friend of deceased by name of Lois Bowden did arrive at the hospital and identified her. She testified she was one of the party who went to Buckeye with her on the 21st; that about 10 o'clock the evening of the 28th she received a call from some unknown party in Phoenix, who requested that she come to the hospital immediately to see deceased. The authorities were immediately notified and commenced a search for defendant and her former husband, Jap Kinsey. They went to her house on Wednesday, the 29th, but did not find her, but finally located her and her ex-husband in a cabin at an auto court some eight or ten blocks away. When they knocked at the door, Kinsey opened it after a little delay and informed the officers that he was alone, but on searching the premises they found defendant hid in the bathroom, and immediately placed her and Kinsey under arrest. The cabin was searched and,

among other things, the officers found a bread box containing a number of surgical instruments, which defendant admitted belonged to her, several of them having upon them stains of fresh blood. They also searched defendant's own house, and found therein a number of towels and sheets, which indicated they had been freshly laundered, and also found in a garage on defendant's premises a pad and some cotton upon which were some fresh blood stains. Defendant was brought to the county attorney's office shortly after her arrest and was questioned by the county attorney, and her statement taken down by a court reporter. During this examination she denied that she knew deceased, or that the latter had ever been to her house, and also denied that Kinsey and the other two men had taken deceased from her house to the hospital. Some time after she was again taken to the county attorney's office, and made a second statement in which she admitted her first one was untrue in many particulars. She then claimed that deceased came to her house Tuesday, the 28th, about 9 o'clock in the morning, and asked if she was a nurse, telling her that she (deceased) had used a curling iron and a hatpin to produce an abortion, and that she needed assistance. Defendant stated at that time that the girl was hemorrhaging profusely, with blood all over her stockings, and shoes. She said she took the girl in to her room and made an examination, and removed a small piece of placenta, which seemed to relieve her for a time, but that about 5 or 6 o'clock she had a severe hemorrhage, and from that time gradually sank until she was taken to the hospital, where she shortly afterwards died. An autopsy, which was performed about noon April 29th, showed conclusively that the cause of the death of Odessa Ball was a hemorrhage brought about by an abortion. It also showed that on the posterior wall

of the uterus there were numerous abrasions, cuts, and lacerations, which, in the opinion of the examining physician, were caused by some sharp cutting instrument, probably a curette. Among the surgical instruments found in the defendant's possession, as aforesaid, were a curette and several speculums, which had fresh blood on them at the time they were seized. He further testified that there was nothing to indicate that an abortion was necessary to save the life of deceased, and that, in his opinion, it had been performed anywhere from a minimum of twelve to a maximum of thirty-six hours before the time of her death.

There are some eleven assignments of error, which we shall consider in the order that seems most advisable. The first is "for error of the court in permitting questions to be asked of the prospective jurors over the objections of defendant." This assignment is obviously insufficient, under rule 12 of this court, in that it does not point out distinctly the particular ruling complained of. We might well, therefore, decline to consider it. *Midkiff* v. *State,* 29 Ariz. 523, 243 Pac. 601; *DeMille* v. *State,* 43 Ariz. 551, 33 Pac. (2d) 280. But even if we attempt to consider it and accept the argument in defendant's brief as pointing out the errors complained of, our attention is called to only eight places in the examination of jurors where it is alleged improper questions were asked. In the first instance, the county attorney reframed the question and counsel for defendant admitted the question, as reframed, was correct. In the second, no objection to the question appears in the record. In the third, the court excused a juror because it evidently felt he was disqualified on the question of circumstantial evidence. The exclusion of a juror by the court, even though erroneous, is of itself never a ground for a reversal, for the defendant is not entitled to have his case tried

by any particular juror, but merely by twelve who are properly qualified and impartial. The fourth refers to the questioning of the juror C. B. Davis. The original question was framed and reframed, and as finally answered by the juror was proper. In the fifth, the objection was sustained by the court. In the sixth, seventh, and eighth, no objection was made. We find no reversible error in the examination of the jury.

The next assignment of error presents a more serious question. As we have said, defendant made two separate statements in the office of the county attorney, which were taken down by the official court reporters, E. W. Powers and H. R. Larson, and thereafter transcribed and offered in evidence; the first statement being marked as "State's Exhibit E," and the second as "Defendant's Exhibit 2." On the state's case in chief, Powers was called as a witness on behalf of the state, and testified to his position as official court reporter and qualifications as such a reporter. He then said that he took a statement of the defendant in the office of the county attorney, and in the presence of the latter and of the sheriff of Maricopa county; that this statement, being the first twenty-six pages of State's Exhibit E, was taken by him in shorthand and was transcribed under his supervision and direction; and that it was a correct transcript. H. R. Larson, the other court reporter, testified, in substance, that he had taken that portion of State's Exhibit E, beginning with page 27, and had caused it to be transcribed, and that it represented a true and correct transcription of the statement as taken. Both reporters were cross-examined in regard to the statement, and a short recess was taken during which time counsel for defendant were permitted to examine State's Exhibit E to their satisfaction. When court reconvened, the exhibit was offered in evi-

dence, certain portions thereof which referred to matters having no legal bearing on the present case being deleted. Objection was made to its admission and defendant was then placed on the stand and testified that she made the statements under duress and threats. Thereafter, the county attorney testified, denying that any threats or inducements whatever were offered to secure the statement in question from defendant. Powers was again called to the stand, and referring to that portion of State's Exhibit E which he had already testified he had taken and caused to be transcribed, was asked whether it would refresh his recollection of Mrs. Kinsey's statement. He replied, in substance, that it would not do so sufficiently for him to testify as an independent recollection. The state then requested that he be permitted to read to the jury a transcript of the notes which he took. Objection was promptly made thereto on the grounds: (a) That it could only be used at the most for the purpose of refreshing the recollection of the witness, and he had stated that it did not give him any independent recollection; (b) that under any circumstances he would be compelled to testify from the original shorthand notes and not from a transcribed copy thereof; and (c) that a request to have the witness read the transcription when he had no independent recollection of it was, in effect, an offer of the transcript itself in evidence. The court overruled the objections, limiting the reporter to that portion of the statement made by the defendant which referred to the deceased, and the transcript was then read by Powers to the jury. Substantially the same proceeding was followed in regard to that portion of the statement taken by Larson.

The fundamental question before us is the extent to which a written record of a statement made or act done, which was reduced to writing at the time by

or under the direction of a person who actually heard the statement or saw the act, may be used in evidence. Whenever a proposition involving facts is at issue, there are two possible methods by which the tribunal which determines the ultimate fact may be persuaded. The first is by the production and presentation to the tribunal of the thing itself as to which persuasion is desired. Familiar instances of this method are the viewing of premises by the jury, the offering in evidence of blood-stained clothing, of the bullet which produced death, of a written contract, and many similar matters. The second method of persuasion falls into two classes, (a) the assertion of some human being that the thing in issue actually does exist, or (b) the assertion of a witness as to the existence of some fact from which the existence of the thing in issue may be reasonably and logically inferred. The first is commonly referred to by the text-writers as testimonial or direct evidence; the other is commonly called circumstantial or indirect evidence. Wigmore on Evidence, vol. 1, 2d ed., § 24; Starkie on Evidence, vol. 1, § 13.

We consider next the various kinds of testimonial evidence, for it is in that class that the evidence under consideration in the present case falls; that is, the testimony of a witness who heard a statement is offered as proof that the statement was made. It is obvious that since such statements are always made at some time prior to the trial where the testimony of the witness is offered, the latter must be speaking as to his recollection or memory of what occurred at some previous time. In so doing, his memory of the previous transaction will be based upon one of three different conditions. First, he may say,

"The fact impressed itself so vividly on my consciousness at the time that it is now clear and fresh in my memory, without the aid of any extrinsic matters."

Second, he may say,

"Lapse of time and the circumstances surrounding the occurrence of the fact are such that I have no unaided independent memory sufficient to enable me now to testify as to the exact thing which occurred, but if you will permit me to refresh or aid my memory by certain extraneous objects, such as a memorandum, it will revivify that memory to such an extent that I will then be able to testify to the thing from an independent recollection thereof."

Third, the witness may say:

"I have no present independent recollection of the thing. You offer me, to refresh that recollection, a memorandum of the thing which I made at that time. I regret that this is not sufficient to refresh my memory to such an extent that I now have an independent revived recollection of the details of the occurrence. I can, however, state positively from both my independent recollection and my present knowledge that I did make or cause to be made the memorandum offered me at the time of the occurrence of the event, and that it was, to my knowledge, a correct record of what actually happened."

These three methods of recollection are commonly referred to as: (a) Recollection in general; (b) present recollection revived; and (c) past recollection recorded. Wigmore on Evidence, vol. 2, 2d ed., § 725 et seq. The first is universally accepted as a proper method of showing the recollection of a witness, and we need not discuss it. The second is also generally permitted, although obviously this method is subject to much abuse for, as was said by Bentham in his Rationale of Judicial Evidence:

"If on the part of the witness the testimony be the product of the imagination, instead of the memory,—incorrectness is, in so far, the quality given to it. If, for want of such helps which on the particular occasion may happen to be necessary, recollection fail to bring to view any such real facts as with these helps

might and would have been brought to view,—incompleteness in the mass of the evidence is the result. But, by the same suggestions by which, in case of veracity, memory alone would be assisted and fertilized, it may also happen that *invention* (which, where testimony is in question, is synonymous with mendacity) shall also be set to work, and rendered productive.''

Notwithstanding this danger of abuse, it is generally accepted that any memorandum or object whatever, no matter when made nor under what circumstances, is eligible for use if it appears that it does revive the present recollection of the witness, but in such a case the witness must testify from his recollection, as *revived,* and not from it as *recorded in the memorandum.* It is the third class of recollection over which much controversy in the courts has arisen. In the early English cases, the distinction between the use of the memorandum as an aid to recollection and its use as evidence of past recollection was hardly appreciated, but by the middle of the eighteenth century, these courts generally permitted the use of the memorandum itself as a direct evidence of past recollection recorded. As was said in Starkie on Evidence, 176:

''The law goes further, and in some instances, permits a witness to give evidence as to a fact although he has no present recollection of the fact itself. This happens, in the first place, where the witness, having no longer any recollection of the fact itself, is yet enabled to state that at some former time, and whilst he had a perfect recollection of a fact, he committed it to writing. If the witness be correct in that which he positively states from a present recollection, viz. that at a prior time he had a perfect recollection, and having that recollection, truly stated it in the document produced, the writing, though its contents are thus but mediately proved, must be true.''

Notwithstanding this, for a long time many members of the bar did not seem to appreciate the differ-

ence between a present recollection revived and a past recollection recorded. This was probably due to the fact that the loose term of "refreshing the memory" was applied both to the renewal of a present actual memory and to the adoption of a past recorded memory. The impropriety of the use of the term to "refresh the memory of the witness," when a past recorded recollection was in question, was well pointed out in the case of *Talbot* v. *Cusack*, 17 Ir. C. L. 213:

" . . . that is a very inaccurate expression; because in nine cases out of ten the witness' memory is not at all refreshed; he looks at it again and again, and he recollects nothing of the transaction; but, seeing that it is in his own handwriting, he gives credit to the truth and accuracy of his habits, and, though his memory is a perfect blank, he nevertheless undertakes to swear to the accuracy of his notes."

The question arose early in the American courts, and the legitimacy of the use of the third method was promptly adopted in regard to certain types of events, such as the subscribing witness to a will, a protest by a notary public, and similar matters. *Pearson* v. *Wightman,* 1 Mill Const. (S. C.) 336, 344, 12 Am. Dec. 636; *Haig* v. *Newton,* 1 Mill Const. (S. C.) 423; *Shove* v. *Wiley,* 18 Pick. (Mass.) 558. The difference between present recollection revived and past recollection recorded is well set forth in the case of *Davis* v. *Field,* 56 Vt. 426:

"Nor was it necessary that the witnesses should have had an independent recollection. . . . The old notion that the witness must be able to swear from memory is pretty much exploded. All that is required, is, that he be able to swear that the memorandum is correct. . . . There seems to be two classes of cases on this subject: 1. Where the witness, by referring to the memorandum, has his memory quickened and refreshed thereby, so that he is enabled to swear to an actual recollection; 2. Where the witness, after refer-

ring to the memorandum, undertakes to swear to the fact, yet not because he remembers it, but because of his confidence in the correctness of the memorandum. In both cases the oath of the witness is the primary, substantive evidence relied upon; in the former, the oath being grounded on actual recollection, and in the latter, on the faith reposed in the verity of the memorandum.''

And this view was somewhat elaborated upon in *State* v. *Easter,* 185 Iowa, 476, 170 N. W. 748, 749, as follows:

''One called to testify as to the existence or nonexistence of a fact may be able to recall the fact by an effort of memory, and state the fact truthfully as of memory. He is then competent to testify as to what the fact actually is. He may be called as a witness to testify to a material fact, and, when called, may not be able to recall the fact; yet his memory may be refreshed by an examination of some instruments submitted to him. If then he is able to speak to the existence of the fact—independent of the memorandum—as of his own personal recollection, he is competent, and is permitted to testify. This is because his mind, by the refreshing influence of the memorandum, is able to recall its existence, and he then speaks to its existence as of his independent recollection, refreshed by the instruments. This does not make instrument competent to speak, but, by its operation on the mind of the witness, the mind becomes repossessed of the fact, and the witness is able to speak to the fact through power of recollection.

''One may be called as a witness who cannot recall the matter about which he is called to testify. He may not be able to refresh his memory so that he is repossessed of the fact, but it may be made to appear that at some time in the past he had a personal knowledge of the fact, and made a record of it. If then he is able to say that he made the entry, or caused it to be made, and at the time it was his purpose or duty to record the fact as it then existed, the record becomes a competent witness, not because it is a record of an event, but because it speaks the past knowledge of a witness

to a fact occurring within the knowledge of the witness, truthfully recorded.''

Notwithstanding this very forceful and logical reasoning, the American authorities are in hopeless conflict upon the question whether a past recorded recollection of events in general is admissible, but a majority, and we think the better considered, opinions, in civil cases at least, uphold the rule of the admissibility of such memoranda of past recollection recorded when the witness who made them or under whose direction they were made testifies (a) that he at one time had personal knowledge of the facts, (b) that the writing was, when made, an accurate record of the event, and (c) that after seeing the writing, he has not sufficient present independent recollection of the facts to testify accurately in regard thereto. 70 C. J. 595–598, and notes. This rule has been applied more sparingly in criminal cases, but even there, we think the better considered cases uphold it. The very recent case of *Cohen* v. *United States,* (C. C. A.) 36 Fed. (2d) 461, 462, is practically on all-fours in its facts with the present one. It was a prosecution for perjury, and the vital question was whether or not the defendant had actually been sworn in the matter in which he was accused of perjury. In order to prove the oath, the state called the stenographer of a deceased referee in bankruptcy, who produced her transcribed notes of the hearing, and testified that they showed the oath was administered by the referee. On cross-examination, she stated she did not recall the actual administration of the oath, but that she knew it was administered, not through her personal recollection, independent of her notes or even refreshed by her notes, but because of the fact that she made a record of the oath administered in the case at the time. She further testified that her transcript was a true and cor-

rect transcript of the proceeding, as taken from her original notes, and that the transcript showed accurately what transpired. The court said:

"This testimony, admitted over the defendant's objection as to the formality of its proof, disclosed a complete and unchallenged record of the administration of the oath, supplemented by the oath of the witness that the record speaks the truth. She testified not from her present recollection, it is true, but rather from her past recollection recorded. This evidence would, without doubt, be admissible in a civil action. *The J. S. Warden,* (C. C. A.) 219 Fed. 517, 519. Was it admissible in this criminal action to prove a like fact?

"The stenographer, though not an official, was employed to take the testimony of witnesses in all bankruptcy proceedings before the referee. Her notes of proceedings and the resultant transcripts constituted the only record of the testimony before the referee and of what the referee did in the performance of his official duties. They were not official documents in a technical sense and therefore did not speak absolute verity but they were enough, when supplemented by the oath of the one who made them, to constitute *prima facie* proof of the facts there recorded. Mere want of a present and independent recollection of all the attending circumstances can not alone destroy their probative value. They were, of course, open to attack and, when confronted by evidence in rebuttal, there would arise a question for the jury as to the truth of the facts recorded, which question the court in this case submitted to the jury even though the appellant offered no evidence in rebuttal."

A somewhat similar question arose in the case of *Commonwealth* v. *Rush,* 277 Pa. 419, 121 Atl. 111, and the same rule was followed. In the case of *State* v. *Hett,* 64 Utah, 505, 231 Pac. 838, the principle just stated was approved, although in the particular case the stenographer had not testified that he had no personal recollection, either independent or revived, of the facts.

Regardless of the weight of the authority on the question, it seems to us that upon every principle of logic and common sense, evidence of this class should be admissible. It is an undisputed and undisputable fact that the human memory weakens with the passage of time, more with some individuals, less with others, but to some extent with all, and that a written record, unless changed by extrinsic forces, remains the same for all time. It would seem, then, that such a record, made contemporaneously with the event by a witness who was honest and capable of observing accurately what happened, would be far better proof of the true facts than the present recollection of that same witness six months later, whether unrefreshed or refreshed by some extrinsic aid, but still in the last resort presumably independent in its nature. There are but two objections to the use of such evidence which have been seriously urged. The first is that it is hearsay in its nature, and the second, that the witness who vouches for the record cannot be properly cross-examined. We think both of these objections are without foundation. The recorded memory of the witness is just as much the statement of that witness as to what he personally saw or heard as is his present independent recollection of the same fact. We think the confusion as to hearsay has arisen from cases where it was endeavored to prove the authenticity of the memorandum which was offered in evidence by some person other than the one who made it or under whose direction it was made. In such a case, of course, the memorandum would be hearsay just as much as if there were an attempt to prove by a third person an oral statement of the person who made the memorandum, in regard to the facts in issue. But when the person who witnessed the event testifies to the accuracy of the memorandum as made, that memo-

randum is just as much direct and not hearsay evidence as the language of the witness when he testifies to his independent recollection of what he saw. The objection in regard to cross-examination, on its face, might seem to have some weight, but we think a careful analysis of the question will show that it also is unfounded. What is the purpose of cross-examination? Obviously it is to convince the triers of fact, in some manner, that the testimony of the witness is untrue, for if the cross-examiner accepts it as true, there will be no need nor desire for cross-examination. How, then, may the truthfulness of the evidence of a witness be attacked through cross-examination? It seems to us that all attacks thereon must be reduced to one of three classes: (a) Upon the honesty and integrity of the witness; (b) upon his ability to observe accurately at the time the incident occurred; and (c) upon his accuracy of recollection of the past events. When a witness testifies as to his present recollection, independent or revived, he may, of course, be cross-examined fully on all three of these points. When he testifies as to his past recollection recorded, he can be examined to the same extent and in the same manner as to the first and second of these matters. He cannot well be cross-examined on the third point, but this is unnecessary, for he has already stated that he has *no* independent recollection of the event, which is all that could be brought out by the most rigid cross-examination on this point when the witness testifies from his present recollection, independent or revived.

■ It is urged by counsel that we have laid down a contrary doctrine in the very recent case of *Cochrane* v. *State,* 48 Ariz. 124, 59 Pac. (2d) 658, 662. The facts in that case were as follows: The defendant had made a statement to the county attorney, which was taken down stenographically and transcribed, just

as the statement of the defendant in the present case. In the Cochrane case, however, there was no attempt to offer the transcript in evidence, nor was there even an effort to refresh the memory of the witness on the stand by such transcript. It was merely used by the examining attorney for the purpose of advising him what questions he should ask of the witness. The objection made was, not that it was not permissible for the county attorney to refresh his own recollection for the purpose of conducting the examination, but that the defendant should have been furnished a copy of such transcription for use in the cross-examination of the witness. The only thing actually before the court was whether it was necessary to furnish the transcript to opposing counsel under such circumstances, and we held that these were private papers of the ones who took the pains and trouble to make them, and that they could not be compelled to furnish copies to the other attorneys. This, as will be seen, presents a very different situation from the present case, where the transcript was read to the jury directly by the person who made it. In the present case, before the transcript was read, counsel for the defendant were given full opportunity for examining it at length, and no objection is predicated on that ground. The two cases were absolutely dissimilar in facts, and the actual ruling in the Cochrane case was undoubtedly correct and in no way in conflict with our conclusion in the present instance. It is true that we did say in that case:

"The law nowhere provides for the taking stenographically of confessions of defendants, and if it is done the notes are not evidence. True, they may be used to refresh the memory of the stenographer in testifying to the confession, or by the county attorney as a memorandum in questioning persons who heard the confession, but they have no probative value whatever."

This, however, was merely *obiter,* in no way necessary, nor did it refer to a situation which actually existed in the Cochrane case. After a mature deliberation and consideration, we are of the conclusion that the language just quoted does state, even as *obiter,* a rule which does not meet with our approval, and in so far as it is in conflict with any conclusion reached herein, we decline to follow it. We hold, therefore, that memoranda of statements made and acts done, when such memoranda are made at the time by witnesses to the statements or acts, and such witnesses testify to the accuracy of the memoranda, are admissible to prove such statements or acts to the same extent as the oral testimony of such witnesses, based on their independent recollection thereof. It was therefore permissible to admit the transcript of the reporter's notes itself in evidence, and if such was the case, certainly there was no reversible error in permitting the witness who made the notes to read them to the jury. In all such circumstances, however, the procedure followed, in this case, of permitting opposite counsel to examine the transcript fully before it was read to the jury, must be followed and, of course, cross-examination permitted in the usual manner. It is contended that the original shorthand notes themselves should have been produced and offered in evidence. They might have been used on cross-examination for the purpose of testing the accuracy of the transcript, but, in view of the fact that the original notes would be figuratively, if not literally, "so much Greek" to the average jury, and even counsel, we can see no reason why it was essential to offer the originals themselves in evidence, if the witness testified that the transcript was a true and accurate transcript of the original notes.

We consider next the objection of the defendant that she was compelled to make the statement contained in State's Exhibit E in the absence of counsel and under fear and duress. Both this statement and Defendant's Exhibit 2 were denials of guilt of any crime, but they did contain admissions and contradictory statements which were proper for the jury to consider in passing upon her guilt or innocence of the crime wherewith she was charged. When this objection was made, counsel for defendant was permitted to examine her as to the circumstances under which she made the statement, and the county attorney and sheriff then gave their version of these circumstances. After hearing the witnesses, the court decided that it did not appear the statement was made under such circumstances that it was inadmissible. Matters of this kind are within the sound discretion of the trial court, and its action will not be reversed unless it appears the discretion has been abused. *Kermeen* v. *State,* 17 Ariz. 263, 151 Pac. 738; *Indian Fred* v. *State,* 36 Ariz. 48, 282 Pac. 930. Particularly is this true when the statement is not offered as a confession, but as an admission against interest. *Lawrence* v. *State,* 29 Ariz. 247, 240 Pac. 863. There was no error in the court's ruling.

Objection is also made that certain portions of the statement were read to the jury, which had no bearing upon the particular crime with which she is charged. We have examined carefully each of these portions of the statement referred to by counsel for defendant, and find they fall generally into two classes: (a) Where no objection was made until after the question had been answered, when a motion to strike was made, which was granted by the court; and (b) where timely objection to the question was made. So far as the former class is concerned, we have held

that a defendant may not allow a prejudicial question to be answered without objection, and then move to strike, and assign error on the admission of the evidence if the motion is granted, even though the question was objectionable in the first place. *Gibson* v. *State,* 25 Ariz. 236, 215 Pac. 729. In each instance of the latter class, we think either that the ruling of the court was correct, or if, perhaps, technically erroneous, was not prejudicial. It must be remembered that in a lengthy statement of this kind, it is very difficult to exclude certain parts and leave a remainder which would be intelligible to the jury, and we think that even though certain portions which were read may have been, strictly speaking, inadmissible, unless it appears that they were of such a nature as to prejudice the jury, it was not reversible error to admit them. There was no reversible error in this respect.

 It is also objected that there were contained in the statement as read to the jury certain statements made by other parties than the defendant. We have examined the instances referred to, in connection with the remainder of the statement, and we think it appears affirmatively, on the face of the record, that the defendant was present when these statements by third persons were made. Under such circumstances they were, of course, admissible if relevant and material.

The next question is whether the court erred in refusing defendant's request to instruct the jury, at the close of the state's case, that they must find her not guilty of the charge of murder in the second degree. The basis of this contention is that the evidence fails to show that murder in the second degree, as defined by our law, was committed. In determining this, it is necessary that we consider the statutory definitions of the different kinds of homicide. The provisions ap-

plicable are sections 4583, 4584, 4586, 4588, and 4590, Revised Code 1928, which read as follows:

"§ 4583. *Murder defined.* Murder is the unlawful killing of a human being with malice aforethought. Such malice may be express or implied. It is express when there is manifested a deliberate intention unlawfully to take away the life of a fellow creature; it is implied where no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart."

"§ 4584. *Degrees of murder.* All murder which is perpetrated by means of poison or lying in wait, torture, or by any other kind of wilful, deliberate and premediated killing, or which is committed in the perpetration of, or attempt to perpetrate, arson, rape, robbery, burglary or mayhem, is murder of the first degree, and all other kinds of murder are of the second degree."

"§ 4586. *Manslaughter defined; penalty.* Manslaughter is the unlawful killing of a human being without malice. It is of two kinds: Voluntary, upon a sudden quarrel or heat of passion; involuntary, in the commission of an unlawful act not amounting to a felony, or in the commission of a lawful act which might produce death in an unlawful manner, or without due caution and circumspection. Manslaughter is punishable by imprisonment in the state prison not exceeding ten years."

"§ 4588. *Excusable homicide.* Homicide is excusable when committed by accident and misfortune, or in doing any lawful act by lawful means, with usual and ordinary caution and without any unlawful intent; or when committed by accident and misfortune in the heat of passion, upon any sudden and sufficient provocation or upon a sudden combat, when no undue advantage is taken nor any dangerous weapon used, and when the killing is not done in a cruel and unusual manner."

"§ 4590. *Justifiable homicide; bare fear as justification.* Homicide is also justifiable when committed by any person: 1. When resisting any attempt to murder any person, or to commit a felony, or to do some great bodily injury upon any person; or, 2. when com-

mitted in defense of habitation, or property, against one who manifestly intends or endeavors, by violence or surprise, to commit a felony, or manifestly intends and endeavors, in a violent, riotous, or tumultuous manner, to enter the habitation of another for the purpose of offering violence to any person therein; or, 3. when committed in the lawful defense of the person, or of a wife or husband, parent, child, master, mistress, or servant, of such person, when there is reasonable ground to apprehend a design to commit a felony, or to do some great bodily injury, and imminent danger of such design being accomplished; but such person, or the person in whose behalf the defense was made, if he was the assailant or engaged in mutual combat, must really and in good faith have endeavored to decline any further struggle before the homicide was committed; or, 4. when necessarily committed in attempting, by lawful ways and means, to apprehend any person for any felony committed or in lawfully suppressing any riot or in lawfully keeping and preserving the peace.''

 ██ It was the theory of the State that defendant committed an abortion upon deceased, which was the direct cause of the death of the latter. ''Abortion'' is defined by section 4645, Revised Code 1928, as follows:

''§ 4645. *Procuring miscarriage.* Every person who provides, supplies or administers to any pregnant woman, or procures any such woman to take any medicine, drugs or substance, or uses or employs any instrument or other means whatever, with intent thereby to procure the miscarriage of such woman, unless the same is necessary to save her life, is punishable by imprisonment in the state prison not less than two years nor more than five years. Every woman who solicits of any person any medicine, drug or substance whatever, and takes the same, or who submits to any operation, or to the use of any means whatever, with intent thereby to procure a miscarriage, unless the same is necessary to preserve her life, is punishable by imprisonment in the state prison not less than one nor more than five years.''

It will be observed from this section that the use of any instrument with intent to procure the miscarriage of a woman, unless the same is necessary to save her life, is declared to be a felony. Under our law "homicide," which may be defined as the killing of a human being by another, must be either (a) justifiable, (b) excusable, (c) manslaughter, (d) murder of the second degree, or (e) murder of the first degree. No other class of homicide is possible.

 It is obvious that if defendant did commit an unnecessary abortion upon the person of deceased, which resulted in the death of the latter, she was guilty of homicide, which clearly could not have been either justifiable or excusable. Neither could it have been manslaughter within the definition set forth above. It must, therefore, have been either murder of the second degree, or murder of the first degree. Obviously, it was not murder of the first degree, so that the only category within which it could fall is murder of the second degree, and that is exactly what the courts in states with statutes similar to ours hold, to wit, that a homicide committed in the perpetration of a felony which is not one of the class making the homicide murder of the first degree is murder in the second degree. *People* v. *Balkwell,* 143 Cal. 259, 76 Pac. 1017; *State* v. *Gibbons,* 142 Iowa 96, 120 N. W. 474; *State* v. *Alcorn,* 7 Idaho 599, 97 Am. St. Rep. 252, 64 Pac. 1014. The court, therefore, did not err in denying the request for an instructed verdict of not guilty of second degree murder.

 The next objection necessary to consider is that the court failed to instruct the jury on the issue of manslaughter. We think its action was correct. Defendant's theory was that she had not performed any abortion whatever upon the person of deceased, but had merely, at the most, attempted to alleviate her

condition after the deceased had already committed an abortion upon herself. The State's theory was, as we have stated, that the defendant had deliberately and intentionally performed an unnecessary abortion upon deceased. If the defendant was correct in her contention as to the true facts, she was not guilty of any crime whatever, for a mere effort to save the life of the deceased, after the abortion had already been committed by the latter herself, would have been an act of mercy, so that under no circumstances shown by the evidence could the defendant have been guilty of manslaughter, and it was not error to fail to charge upon that class of homicide. Further than that, defendant made no request for a charge of this nature, either originally or when asked by the court if any further instructions were desired, and this is a waiver of any failure to give instructions which might have been otherwise proper on this point. Rule 5, § 4, Uniform Rules, Superior Courts.

 We come next to the refusal of the court to permit the defendant to prove as part of the *res gestae* an alleged statement of the deceased made on the morning of Tuesday, April 28th, to the witness Margaret Ward. Counsel for the defense, in his opening statement to the jury, stated that he expected to show, among other things, that the deceased on Tuesday morning, April 28th, came to the home of Margaret Ward, under certain conditions set forth in the statement. Mrs. Ward was called to the stand, and then was questioned without objection as to every material matter set forth in the opening statement aforesaid. In addition to this, the following questions and answers were given:

"Q. Did you have a conversation with her (deceased) at that time? A. I did.

"Q. And what was that conversation?"

Objection was then made to any evidence as to the alleged conversation, and was sustained by the court, whereupon the following avowal was made:

"We propose to show the conversation relates directly to the incidents that are charged here in this information. We expect to show—of course I don't want to announce this before the jury, but we will show it was connected up, and the occasion for coming and being—in connection with her residence later at the house of this defendant."

No other nor more complete offer was made. We are unable to determine therefrom what the nature of the conversation was, who was present, or anything which would assist in determining whether it was admissible or not. In the absence of any showing as to what the conversation which defendant offered to prove was, we cannot say the court erred in excluding it. There is no error in its ruling on this point.

 The next objection is that the court's instruction in regard to circumstantial evidence was improper and calculated to mislead the jury. This instruction was as follows:

"Now gentlemen, circumstantial evidence is as follows: Circumstantial evidence in a criminal case is the proof of such facts and circumstances connected with or surrounding the commission of the offense charged as shows or tends to show the guilt or innocence of the accused."

And it is contended that this would cause the jury to believe that it was sufficient to connect the defendant with the commission of the crime by circumstantial evidence, even though these circumstances were as consistent with the hypothesis of innocence as that of guilt. If this were the only instruction upon circumstantial evidence, there might be some merit in the contention, but we have held repeatedly that instructions must be construed as a whole and not by taking

isolated portions thereof. *Macias* v. *State*, 39 Ariz. 303, 6 Pac. (2d) 423. The court also instructed the jury as follows just before the instruction complained of:

"Now gentlemen, I further instruct you that where the State relies upon circumstantial evidence to convict, that all of the facts and circumstances taken together, if proved, must not only be consistent with the inference that the accused is guilty, but at the same time they must be inconsistent with the hypothesis of innocence, and to establish to the satisfaction of the minds of the jury the guilt of the accused, beyond a reasonable doubt.

"Now gentlemen, I further instruct you that circumstantial evidence is legal and competent evidence in a criminal case, and if it is of such a character as to exclude every reasonable hypothesis other than that of the guilt of the defendant, then it is sufficient to authorize a conviction. In other words, circumstantial evidence alone is sufficient to authorize a conviction when it convinces a jury beyond a reasonable doubt as to the guilt of the accused."

We think that taken together it was an explicit instruction to the jury that circumstantial evidence was not sufficient to convict unless it was inconsistent with the hypothesis of innocence and excluded every other reasonable hypothesis than that of the guilt of the defendant, and must have been so understood. This concludes the assignments of error.

 We realize the importance of the case to the defendant, and have examined carefully, not only the specific errors assigned, but also the entire transcript of the evidence in the case, and we are satisfied therefrom that, while the conviction was based on circumstantial evidence alone, yet that evidence is of such a nature that it excludes every reasonable hypothesis except that the defendant did commit an abortion upon the person of Odessa Ball when it was unneces-

sary in order to save the life of the latter, and which abortion resulted in her death.

Such being the case, the jury properly found the defendant guilty of murder of the second degree, and the judgment of the superior court is affirmed.

McALISTER, C. J., and ROSS, J., concur.