307 P.2d 916

**The STATE of Arizona, Appellee,**

**v.**

**Bennie Wallace BUTLER, Appellant.**

**No. 1091.**

Supreme Court of Arizona.

March 5, 1957.

Mesch, Kemper & Jasper, and Bernard Weinstein, Tucson, for appellant.

Robert Morrison, Atty. Gen., M. J. Mirkin, Asst. Atty. Gen., Raul H. Castro,

County Atty. of Pima County, and George B. Morse, Deputy County Atty., Tucson, for appellee.

UDALL, Chief Justice.

Bennie Wallace Butler, defendant-appellant, was informed against, tried, and convicted by a jury of the crime of grand theft, a felony (section 43–5501, A.C.A. 1939, now section 13–661, A.R.S.), and he appeals from the judgment of conviction thereon. Prior to trial the county attorney filed an amended information to include an allegation of a previous conviction of grand theft, which charge was admitted by defendant out of the presence of the jury. The court imposed an indeterminate sentence of from ten to eleven years in the state penitentiary.

Specifically, the defendant, a 25-year-old negro, was charged with the stealing, on or about January 31, 1955, of a Francis Bacon baby grand piano, the personal property of one Scott B. Appleby and having a value in excess of $50. At the trial he elected, as was his right, not to take the witness stand, nor were any witnesses called to testify in his behalf; hence, there is no particular conflict in the evidence.

At the close of the State's case the defendant moved for an instructed verdict upon the ground that the State had failed to prove the necessary elements of the crime of grand theft. A denial of this motion is the basic error assigned on this appeal. Specifically, defendant is contending there is no proof that (a) the piano taken was in fact a stolen article, and (b) the piano in question was taken from the possession of the owner Appleby without his consent.

Further contentions assert, (c) the evidence was insufficient to warrant the court's giving an instruction (State's No. 3) as to the inference to be drawn from the actual, unexplained possession of recently stolen goods (providing the jury found such to be a fact), and (d), if argument (c) is sound, then the effect of this charge was to tell the jury that the burden of explaining how he obtained possession of the piano was placed upon the defendant. Obviously, the correctness of this instruction as a whole is dependent upon the answer to (c) —and that depends upon the answers to (a) and (b)—as there is no claim the instruction was otherwise erroneous.

In Pass v. State, 1928, 34 Ariz. 9, 10, 267 P. 206, this court laid down the following rule:

"* * * The essentials of the crime of larceny [now called theft] are, first, the taking of the thing which is the subject of the crime from the possession of the owner into the possession of the thief; and, second, an asportation thereof."

Inherent in such use of the word "taking" is, as stated in 32 Am.Jur., Larceny, section

10, that it be " * * * without the consent and against the will of the owner, involving a trespass to the latter's possession or its equivalent * * *." With this yardstick in mind, let us examine the evidence to see if defendant's assignments of error are well taken. Counsel for defendant conceded the asportation was fully established. Under our well-established rules the evidence will be stated in a light most favorable to a sustaining of the judgment.

As will appear from our recitation of the facts, much of the evidence is circumstantial in character, as the State produced no eye-witnesses to the actual taking of the piano in question. From the record, stated chronologically, it appears Scott B. Appleby owned a home at 340 Avenida de Palmas, in the area known as Colona Solana in Tucson, Arizona. At the time of the alleged theft the house was at least in part furnished but unoccupied. It was not shown who then had the key to the house. Ezekial Butler, father of defendant, who had worked for Mr. Appleby for three years past, was responsible for taking care of the outside of the house and the shrubbery as well as keeping the yard clean. He had no key to the house and no way to get in, but on his two or three trips per week to the place he checked to see that the doors were locked. At times during the period of his employment his son (the defendant) had helped him with the heavier work in the yard. He further testified that he had previously seen the piano in the home and when it was returned after the incidents in question, he recognized it as being the same piano. It was established that customarily Mr. and Mrs. Appleby lived most of the year in Washington, D. C., and spent only two or three months in the wintertime at this Tucson home.

Frank P. Rivera, who had known defendant for some six years, testified that in the early part of January 1955 the defendant told him "he had access to a house" in Colona Solana and suggested Rivera get a trailer and they would go there. This was done and according to Rivera they walked in the front door of the unoccupied home, and with the aid of defendant he (Rivera) took a washing machine, a table, a stove, and a lamp. Thereafter he plead guilty to a charge of second degree burglary arising out of that transaction and was then awaiting sentence. Witness Rivera further testified that while they were in the house in January 1955 he observed the baby grand piano in question but that it was not taken at that time nor did he have any further knowledge relative to its removal as he was at the house only the one time.

Benjamin H. Bernstein, a furniture dealer in Tucson, testified that he was the proprietor of "Valley Fair" and at times purchased secondhand goods. He identified the defendant as one who first came to his place of business during the first or

second week of January 1955 and made inquiry if he wanted to buy a piano that belonged " * * * to him and his sister, and his sister was in San Francisco, and that he was moving and he was going to join her there." This witness testified that he told defendant he would be interested in buying same—but not without seeing it. On January 31, 1955, defendant returned in an automobile with two Mexican boys, with the piano in question loaded into a trailer hitched thereto. The piano had the legs removed and was badly scratched up but after some bargaining Bernstein bought it from defendant for $110, which was paid to him in cash. At the same time he had defendant sign a police report covering the sale, which document was admitted in evidence. This witness testified he upbraided defendant for not letting him come over to the house and see the piano before buying it and that he would have removed it without damaging same. He placed an actual value on the piano of $550.

Irene Holland, a real estate broker, testified she was at the Scott B. Appleby home on or about February 24, 1955, because one of her customers was interested in the place and wanted to inspect it. She did not have a listing so went to the home to procure one but found the outside door was ajar and the place seemed deserted as no one was around. After looking about she returned to her office and, as the customer was still interested, she went to the assessor's office at the courthouse and obtained the name and address of the owner. Later that evening she called Mr. Appleby by long distance telephone and apprised him of the house being open.

The Tucson police did not investigate the matter until March 2, 1955, though the report of sale by defendant to Bernstein had reached them within 24 hours after its execution. A criminal complaint was filed by Police officer Larry Wilson against defendant on March 5, 1955. Pictures, admitted in evidence, were taken of the piano at "Valley Fair" in August 1955. Thereafter the police ordered the piano moved back to the Appleby home because of a storage problem.

Apparently neither Mr. or Mrs. Appleby found it convenient to be at the trial which was held on February 2, 1956, and neither of them were called as witnesses. Clarice Jackson, the personal maid of Mrs. Appleby for 29 years, did testify. She stated Mr. Appleby had told her the evening before to come down and identify the piano as he was leaving town, going to Atlanta, Georgia. It appears from her testimony she was in Washington, D. C., from March 1953 to January 1956 and, hence, knew nothing of the alleged offense. She had, however, previously seen the defendant working with his father around the Tucson home of the Applebys, and was present when Mrs. Appleby bought the piano in the year 1950; she stated this was the same

piano that was now back in the home. Without objection she further testified:

"Q. Do you know whether or not Mr. Scott Appleby owns a Francis Bacon Baby Grand piano?

"A. Yes, he does.

"Q. Do you know whether or not he owned that Piano on the 31st day of January, 1955?

"A. Yes, he did."

Defendant's father, in testifying for the State, stated defendant had always lived with him—except for a short period when he was away in California—that the boy never had a piano of his own, and that he did not authorize any one to take the piano in question out of the Appleby home.

We recognize there is some authority that lack of consent by an owner to the taking of his property must be shown by direct evidence which includes the testimony of the owner. See, State v. Morey, 1853, 2 Wis. 494, 60 Am.Dec. 439, and State v. Moon, 1877, 41 Wis. 684. In Wigmore on Evidence, Vol. VII, 3rd ed., section 2089, it is explained that this rule (if it is a rule) is the outgrowth of a single English decision subsequently repudiated in that country. This court in Douglas v. State, 26 Ariz. 327, 225 P. 335, clearly indicated that the corpus delicti can be established by circumstantial evidence alone, and it is apparent that the modern trend is that non-consent of the owner in theft cases can be so shown; we expressly adopt this "modern" rule. See the following: Bowles v. State, 14 So.2d 269, 270, 153 Fla. 219; Lovejoy v. State, 130 Neb. 154, 264 N.W. 417, 420; State v. Patterson, 347 Mo. 802, 149 S.W.2d 332, 333; Fuller v. State, 70 Okl.Cr. 408, 106 P.2d 832, 835; cf. State v. Romo, 66 Ariz. 174, 185 P.2d 757, 766, and Kinsey v. State of Arizona, 49 Ariz. 201, 212, 65 P.2d 1141, 125 A.L.R. 3.

It should be noted that in some cases this rule is limited in that there must be a satisfactory explanation of the owner's absence from the trial. If the rule is sound at all, there is nothing in favor of such limitation for his absence merely goes to the weight of the circumstantial evidence and, ultimately, to the question of reasonable doubt. Wigmore, supra, apparently is of the same view as is the Supreme Court of Nebraska, indicated in Lovejoy v. State, supra, and earlier in Palmer v. State, 70 Neb. 136, 97 N.W. 235.

To warrant a conviction it is necessary, of course, that the circumstantial evidence so offered should not only be consistent with guilt but inconsistent with every reasonable hypothesis of innocence. See, Paddock v. United States, 9 Cir., 79 F.2d 872, 876, and cf. State v. Carter, 66 Ariz. 12, 20, 182 P.2d 90, 95. We hold the record made before the court below justified submitting the case to the jury, and the

30

latter was entitled to find the above test was met in that it could have found—and, by its verdict necessarily did find—that all facts and attendant circumstances, together with the inferences properly deducible therefrom, pointed unerringly to the commission by the defendant of the crime of grand theft.

In view of this conclusion we see no occasion to discuss the other assignments of error dealing with the giving of Instruction No. 3.

Judgment affirmed.

WINDES, PHELPS, STRUCKMEYER and LA PRADE, JJ., concur.