234

568 P.2d 1132

Grace BLACK, a single woman,
Appellant,

v.

The STATE of Arizona, Cochise County, a
body politic and political subdivision of
the State of Arizona, and John F. Glass,
V. L. Thompson, A. J. Gilbert, Jr., as
members of the Cochise County Board of
Supervisors, James Wilson, Sheriff of
Cochise County, the City of Bisbee, Mike
Denny, Ed Holly and Oake Walker, Ap-
pellees.

No. 2 CA–CIV 2415.

Court of Appeals of Arizona,
Division 2.

July 27, 1977.

Verity, Smith, Lacy, Allen & Kearns, P. C. by Bruce Rinaldi, Tucson, for appellant.

Bruce E. Babbitt, Atty. Gen., Jones, Teilborg, Sanders, Haga & Parks by Robert J. Bruno, Sp. Asst. Atty. Gen., Phoenix, for appellee the State of Arizona.

Lesher, Kimble & Rucker, P. C. by William Kimble, Tucson, for appellees Cochise County and City of Bisbee.

## OPINION

RICHMOND, Judge.

Appellant, a passenger in a van operated by Francisco Romero, was injured when the vehicle in which she was riding skidded into a stationary automobile on U. S. Highway 80 between the Mule Pass summit and the Bisbee traffic interchange. The accident occurred after dark. It was snowing and the highway was slick. She sued Romero; the operator of the stationary vehicle, Ramon Robles; the State of Arizona, County of Cochise, City of Bisbee, and four law enforcement officers employed by the various governmental units, who had been trying to help Robles immediately before the accident.

At trial, after plaintiff had rested, the court directed a verdict in favor of Robles, Cochise County, Bisbee and the law enforcement officers, and submitted to the jury the case against Romero, and against the State of Arizona on the issue of negligence in maintenance of the highway. The jury returned a verdict against Romero but in favor of the state.

Four questions are raised on appeal from the judgment in favor of the governmental entities and officers.[1] The first deals with an evidentiary ruling and the last two with jury instructions; we find no error in these matters for reasons hereinafter set forth. The remaining question as to the propriety of the directed verdicts requires more detailed analysis.

The facts viewed most favorably to the party against whom the verdicts were directed are as follows. Robles and his family were proceeding toward Tucson from Douglas when his car lost traction and came to a stop on the grade leading up toward Mule Pass. The first law enforcement officer to come to his aid was Ed Holly of the

---

1. No appeal has been perfected from the judgment in favor of Robles.

Bisbee Police Department, who parked his police car behind the Robles vehicle. Next on the scene was an Arizona Highway Patrol car operated by Hector Berrellez, an officer of the Department of Public Safety, who parked behind Holly. Shortly thereafter two Cochise County deputy sheriffs, Michael Denney and Oakie Walker, arrived and parked at the end of the line, which by then also included another private vehicle. As each of them arrived, the officers left their vehicles and approached the Robles car, leaving on the flashing emergency lights mounted on top of each patrol car.

Approximately 10 minutes after Holly had reached the scene, the Romero vehicle coming from Tucson toward Douglas started down the grade. As Romero rounded a bend 550 feet from the Robles car, he saw headlights shining across the highway and the flashing emergency lights on the patrol cars. He thought there was an accident ahead and that the lane in which he was traveling might be obstructed. He tapped his brake pedal once, then a second time. He felt the van start to slide to the left across the highway, toward the lights, slammed on his brakes and, after they locked, the vehicle continued into the Robles car and then spun back across the highway, coming to rest against the mountainside.

Appellant's contention that the officers were negligent was based on three theories: (1) they should have removed the Robles vehicle from the highway before the accident; (2) they should not have created the confusion resulting from three sets of flashing emergency lights; (3) they should have acted to provide advance warning of the situation to drivers like Romero approaching from the summit.

■ As to appellant's first two theories, we agree with the trial judge that no reasonable man could find negligence in the officers' failure to have removed the Robles car from the highway before the accident, or in using the emergency lights mounted on the top of each vehicle as it in turn arrived at the scene. The Robles car was stopped either partially on or adjacent to the shoulder, leaving unobstructed more than half of the 40-foot paved highway. Equipment for clearing the roadway of snow and ice, and sanding it if necessary, had been summoned and could be expected to arrive shortly. Attempting to move the car under the circumstances presented at least as many hazards as allowing it to remain where it had stopped. The most apparent danger was that the driver of another vehicle proceeding in the same direction would come unaware upon the rear of the growing line of vehicles headed by the Robles car, and we are unable to see how reasonable men could find it negligent for each officer to have used his flashing emergency lights as he took his place at the back of the line.

■ As to the third theory, we need not decide whether illumination reasonably necessary for the safety of traffic proceeding in one direction may create a hazard requiring advance warning to persons proceeding in another. It is not enough that the officers may have been negligent unless the evidence would support the conclusion that any such negligence was the proximate cause of appellant's injuries. *Morris v. Ortiz*, 103 Ariz. 119, 437 P.2d 652 (1968). On that issue it is necessary to examine Romero's version of the events leading to the accident:

"Q. At that point, when you first saw him, did you know whether the road was open, closed, or people were strung all over the road or what?

"A. I had no idea.

"Q. All right. Tell the jury what you did, please?

"A. I was in second gear already, so I decided to stop and I tapped my brakes about twice and tried to slow the vehicle down.

"Q. Were you having any luck?

"A. It was slowing down a little. And then, it seemed to hit a patch of snow and it just swerved to one side, the back end. Then when it swerved like that (indicating), I was, I would say, about oh, about fifty feet away from that vehicle and I was heading toward it, so I slammed on

my brakes and then I turned with a swerve and my van slid the other way and then my right front fender hit the middle of his car and at the time of impact, my van spun around about three times. I wound up against the side of the mountain."

\* \* \* \* \* \*

"Q. Now, Mr. Romero, as you rounded this curve, however far it may have been from the actual point of impact—

"A. Right.

"Q. —you made some observations with regard to lights, did you not?

"A. When I made the turn?

"Q. Yes, after you came around the curve?

"A. Yes.

"Q. You observed several things about the lights. First of all, you observed some headlights?

"A. Right.

"Q. Ordinary round white type headlights, correct?

"A. Correct.

"Q. You also observed some, what we call, gumball machines or top mounts or whatever you want to call them, on top of police vehicles?

"A. Right.

"Q. And you knew in your own mind at that point in time, didn't you, Mr. Romero, regardless of how far you were away from the point of the ultimate accident, that something was going on in the road?

"A. Right.

"Q. That there was an accident or something, correct?

"A. Correct.

"Q. And you acted accordingly, did you not, you slowed down?

"A. I tried to stop.

"Q. Okay, you had a chance to observe the condition and you reacted to the condition by attempting to slow your vehicle, right?

"A. Stop.

"Q. To stop your vehicle?

"A. Right.

"Q. And in doing this, Mr. Romero, initially you tapped your brakes?

"A. Right.

"Q. You tapped them once and then you tapped them a second time?

"A. Right.

"Q. Correct?

"A. Correct.

"Q. And you did that, sir, because you realized that road might be slick, that is, you tapped it rather than put them on hard, didn't you, sir?

"A. Yes, I did.

"Q. And you have taken the driver's examination here in Arizona, haven't you?

"A. Yes, I have.

"Q. Had occasion to read the driver's manual?

"A. Yes.

"Q. And you knew at that time that the driver's manual and everything else, told you on slippery road, to tap your brakes gently and don't lock them up, right?

"A. Right.

"Q. And that is why you did it, wasn't it, Mr. Romero?

"A. Right.

"Q. And when you tapped your brakes, you didn't lose it, did you sir?

"A. No, I didn't.

"Q. You didn't even have any fishtailing, did you, sir?

"A. No, I didn't.

"Q. Then you went over a slick spot?

"A. Right.

"Q. And you started to get some movement in the rear end of the van, is that right?

"A. Yes, I did.

"Q. And then is when you applied the brakes and locked them up, isn't it sir?

"A. Well, I was too close to a vehicle then, it was my last resort slamming the brakes.

"Q. Mr. Romero, I can appreciate that fact, sir, I'm now just trying to find out what happened rather than why you did it?

"A. Right.

"Q. It was when you went over the spot or whatever it was—

"A. Yes.

"Q. —and the rear of your vehicle started to move?

"A. Right.

"Q. That you slammed on the brakes and locked them up?

"A. Right.

"Q. And it is then that the rear end of your vehicle started to rotate clear around, wasn't it, sir?

"A. It didn't rotate clear around.

"Q. It started to rotate?

"A. It swerved a little.

"Q. Tell me what you mean by that, Mr. Romero?

"A. It slid, rear end slid to my left.

"Q. Okay.

"A. So then I put on the brakes and tried to stop and my car fishtailed over to the other side and that is when I hit them.

"There was no spinning whatsoever until after impact.

"Q. Let me understand then, perhaps I did misunderstand what happened. You tapped the brakes and you had no loss of control, right?

"A. Twice.

"Q. Twice, you then passed over whatever—

"A. Uh-uh.

"Q. —and you felt some movement in the rear end?

"A. Rear end and the van started sliding.

"Q. Started sliding to the left?

"A. Right.

"Q. The entire van?

"A. Entire van.

"Q. Okay, and then you locked up the brakes?

"A. Right."

\*　　\*　　\*　　\*　　\*　　\*

"Q. When you tapped the brakes, as I understand it, that actually resulted in the car slowing down?

"A. Very little.

"Q. But it wasn't sliding at that point, was it?

"A. No.

"Q. It slowed down as much as tapping the brakes would slow down a car ordinarily, right?

"A. Right.

"Q. And it wasn't until you hit the slick spot that you had any problem?

"A. Right.

"Q. Would it be fair to say, Mr. Romero, that if you hadn't hit this slick spot, you wouldn't have had any trouble going on down the road in the eastbound lane of traffic?

"A. Probably not."

\*　　\*　　\*　　\*　　\*　　\*

"Q. And you are not changing your testimony, are you, that if you hadn't hit the slick spot—

"A. That I would have?

"Q. You would have had no difficulty in avoiding the collision?

"A. Right.

"Q. Because you could have gone right down that eastbound lane?

"A. Right."

From the foregoing it is clear that the condition of the roadway, rather than any braking action in response to the emergency lights, caused the Romero vehicle to go out of control. It follows that failure to warn Romero earlier of the situation created by the Robles car could not have afforded a basis for liability.

In *Walker v. County of Coconino*, 12 Ariz. App. 547, 473 P.2d 472 (1970), Division One of this court enunciated a duty of the responsible governmental body to use reasonable means to mitigate the danger of ice on a road caused by rain or snow. Even if Romero's initial brake applications had no causal connection with the accident, appellant argues, actionable negligence could have been based on the officers' failure to warn of the road condition that precipitated his loss of control. She contends the directed verdict in favor of Berrellez precluded her arguing this theory against the state, despite submission to the jury of the issue

of its negligence in maintaining the highway.

In *Walker*, however, the court was dealing with dissimilar facts. Plaintiff-driver there also proceeded into a downhill curve, but came unexpectedly upon a patch of ice. The accident occurred on a clear day and there had been no storm in the area for at least two days previous. The highway was free of moisture except for two or three other much smaller patches of ice at different spots some distance from the accident scene.[2] In contrast, Romero testified:

"Q. As you came around that curve, what were the road conditions on January 1st, that night?

"A. The snow was getting heavy and I noticed patches of snow on the road."

\* \* \* \* \* \*

"Q. When you started down toward the accident, in any case, you knew you were on a downgrade, didn't you, sir?

"A. Right.

"Q. And you knew it was seven percent?

"A. Right.

"Q. And that is why you shifted into second, sir?

"A. Right.

"Q. And the fact that you were on a downgrade before this accident happened, came as no surprise to you, did it, sir?

"A. No.

"Q. You knew also, didn't you, sir, that if there was no [sic] snow on the road, it was slippery?

"A. Right.

"Q. And this was something you were aware of from having been a driver for a good number of years?

"A. Not on snow.

"Q. Well, from taking driver's tests or just plain old common sense, Mr. Romero, you knew if there was snow on the road, it would be slippery?

"A. Right.

"Q. And if in fact you observed snow on the road that day, it would have come as

no surprise to you, would it, sir, that the road would have been slippery?

"A. No.

"Q. You had, as a matter of fact, Mr. Romero, even considered turning back to Tucson, hadn't you, when it started to snow?

"A. Right.

"Q. And you decided against it, you decided to press on?

"A. Uh-huh, yes.

"Q. So you were aware, were you not, sir, as you traveled that area before the accident occurred, that if it continued to snow and it continued to stick, that the road might be slick?

"A. Right.

"Q. And you had some concern about road conditions, didn't you, sir?

"A. Yes, I did.

"Q. You drove accordingly?

"A. Right

"Q. So the fact that there was some slickness to the road, Mr. Romero, before this accident happened, was no surprise to you, was it, sir?

"A. No, it wasn't."

■ There is no duty to warn against known or obvious dangers. *Maas v. Dreher*, 10 Ariz.App. 520, 460 P.2d 191 (1970); Restatement of Torts 2d § 343 A(1); *see Brierley v. Anaconda Company*, 111 Ariz. 8, 522 P.2d 1085 (1974).

Thus, the court properly withdrew from the jury's consideration the question of actionable negligence on behalf of the officers, submitting only the issue of whether or not the state otherwise exercised reasonable care in maintenance of the highway.

■ As indicated above, we find no error in the trial court's rejection of certain evidence. In an attempt to impeach Berrellez's testimony as to when he arrived at the scene, appellant offered notes made more than three years earlier by Romero's attorney at a trial on a traffic citation. The

---

2. A directed verdict for the defendant county was affirmed, there being insufficient evidence on which to base a finding of constructive notice of the dangerous condition, and no evidence of actual notice.

attorney disclaimed any independent recollection of the testimony at the earlier trial, even after reviewing his notes, and they were offered as past recollection recorded. In order to come under this exception to the hearsay rule, memoranda must be supported by testimony of the witness who made them, or under whose direction they were made, that (a) he at one time had personal knowledge of the facts, (b) the writing was, when made, an accurate record of the event, and (c) after seeing the writing, he has not sufficient present independent recollection of the facts to testify accurately in regard thereto. *Kinsey v. State of Arizona*, 49 Ariz. 201, 65 P.2d 1141 (1937). The offered exhibit contained only summaries of answers taken from context by an attorney for an interested party. The attorney told the court:

> " . . . I certainly can't tell you word for word what was said. I think I do know the question in substance that *would have been asked*, for me to write down what I wrote. But I can't testify ---"

What was being offered was the attorney's conclusion, based on the summarized answers and without any refreshed recollection, of what had been asked and by whom. The need for such supplementation clearly illustrates the absence of an accurate record, as required by *Kinsey*.

■ Appellant next complains that a jury instruction substituted by the trial court for one she offered on the state's duty of care in maintaining a state highway was defective in omitting to equate a breach of that duty to negligence. The instruction, however, in pertinent part, contained the following:

> "If a State roadway should suddenly without fault of the State of Arizona come by any means into a condition dangerous to travel, the State of Arizona is liable for damages occasioned thereby if the State fails to act in a reasonably prudent manner under the circumstances."

The jury had been instructed earlier that "negligence is the failure to use reasonable care," and that "a person is negligent if he fails to act as an ordinarily careful person." Even if it was unable to equate those definitions with the instruction in question, the jury was told specifically that the state "is liable for the damages occasioned thereby if the State fails to act in a reasonably prudent manner under the circumstances." We find no error in omission of the word "negligent."

■ Finally, appellant objects to the trial court's refusal to instruct the jury as requested that more than one person may be liable for causing an injury. Inasmuch as other instructions and the various possible forms of verdict adequately covered the possibility of joint liability, we fail to find any prejudice in refusal to give the offered instruction.

Affirmed.

HOWARD, C. J., and HATHAWAY, J., concur.