UNITED STATES, Appellant

v

ROBERT I. WEBB, Sergeant First Class,
U. S. Army, Appellee
12 USCMA 276, 30 CMR 276

No. 14,653

Decided April 14, 1961

*Lieutenant Colonel Gilbert G. Ackroyd* argued the cause for Appellant, United States. With him on the brief were *Lieutenant Colonel James G. McConaughy, Captain William A. Zeigler,* and *First Lieutenant Barry L. Kroll.*

*First Lieutenant Burnett H. Radosh* argued the cause for Appellee, Accused. With him on the brief was *Lieutenant Colonel W. H. Blackmarr.*

## Opinion of the Court

GEORGE W. LATIMER, Judge:

Accused stands convicted by general court-martial for the barracks larceny of $40.00, in violation of Article 121, Uniform Code of Military Justice, 10 USC § 921. He was sentenced to bad-conduct discharge, total forfeitures, confinement at hard labor for six months, and reduction to the grade of Recruit E-1. The convening authority approved, but a board of review in the office of The Judge Advocate General of the Army held that certain evidence introduced by the prosecution against accused was inadmissible. And because it considered that evidence the only persuasive indication of accused's guilt, the board was unwilling to sustain his conviction. Accordingly, it set aside the findings and sentence, and ordered the proceedings dismissed. Thereafter, The Judge Advocate General certified the case to this Court under the provisions of Article 67(b).(2) of the Uniform Code, 10 USC § 867, seeking a determination of whether the holding of the board of review was correct. We note parenthetically that, at the time of his action, The Judge Advocate General remitted the unexecuted portion of accused's sentence.

A proper understanding of the issue necessitates some development of the facts. As the parties are not in disagreement with respect thereto, we state them generally. During the early morning hours of the day in question, the victim, one Private Bruner, lay asleep in his bunk, clad in his undershorts. The afternoon before, he had been paid, and included in the money he drew were three new twenty dollar bills. These bills were in his wallet, which he had hooked over the waistband of his shorts upon retiring. At about 1:30 a.m. he was awakened by someone in his bed attempting to unfasten his underclothes. Bruner drove the intruder away and gave chase as the latter fled. He was unable to catch him, however, and the man made good his escape through the window of a cadre room and disappeared. It was at that point that Bruner discovered his wallet was missing. He immediately reported his loss.

Lieutenant Cerini, Bruner's company commander, was apprised of these events. He recalled that he had prepared his men's pay in alphabetical order, and had used new twenty dollar bills which were in sequence according to serial number. Therefore, as soon as he learned of the theft, Cerini contacted, by telephone, the two men immediately before Bruner on the pay roster, and the two men immediately after him. When, pursuant to his orders, the four had been roused from bed and called to the phone, the Lieutenant, without apprising them why he desired the information, directed them to read off slowly the serial numbers on the twenty dollar bills they had. As each complied Cerini noted the numbers on a piece of paper, and checked the figures by having the men repeat them and by reading the numbers he had recorded back to each man. All four of these men, like Bruner, were trainees, and the pay of each had included three new twenty dollar bills. When Cerini completed his list, it reflected a group of serial numbers in sequence except for three omissions in the middle which would identify the bills Bruner had received. At a subsequent time the Lieutenant had this original memorandum typed, in the interest of preserving the information in a neat and orderly form. He personally compared the typewritten statement against the original and made certain it was accurate. The handwritten list he had prepared at the time the calls were made was discarded.

Later on the day in question, a criminal investigator, who suspected accused, had him report for interrogation. After proper warning, accused voluntarily produced his paper money. Among the currency were two twenty dollar bills bearing serial numbers

missing from the middle of the sequence on the memorandum Cerini prepared.

At trial, the Lieutenant testified about obtaining the numbers from the four men and stated categorically that although he had not copied the information from the bills or personally checked his figures against them, he had recorded correctly the information the men gave him over the telephone. None of the four had seen the list Cerini made, but each asserted under oath that he had correctly read the serial numbers from his bills to him. Neither Cerini nor any of the four men, however, could recall the numbers. Over objection by defense counsel, the law officer received Lieutenant Cerini's typewritten statement in evidence as a past recollection recorded. This information furnished the prosecution with an essential link in the chain of circumstances which identified the accused as the thief. The board of review ruled the exhibit inadmissible, and the correctness of that holding gives rise to the certified issue.

The board members commended the company commander's ingenuity, but they ruled out the evidence on the ground that he did not actually inspect the bills paid the four men to verify the serial numbers. Thus, the board reasoned, he did not have personal knowledge of the correctness of the facts he transcribed, and accordingly they were not admissible as a past recollection recorded but constituted mere hearsay. For reasons which will hereinafter appear, we agree with conclusions reached by the board.

We commence our development with reference to the general principle that a necessary predicate for admission of a past recollection recorded includes knowledge by the witness that the facts were correctly set forth even though they be presently forgotten. See Manual for Courts-Martial, United States, 1951, paragraph 146*a*. That point of law is well settled. Obviously, therefore, had Lieutenant Cerini's testimony by itself been the sole foundation for admitting the questioned evidence, the holding by the

board of review would be correct, for his statements identifying the currency by serial number would be hearsay. He copied not the numbers from the bills, but merely recorded those read to him over the telephone, and he had no personal knowledge as to the truth of the information furnished. Hence he could not himself assure the court-martial of the correctness of the numbers. However, his testimony did not stand alone and we must therefore consider the fact that the memorandum in question was not Cerini's individual effort but the product of a joint enterprise by the Lieutenant and the four men. In connection with that type of situation, we made the following observation in United States v Bergen, 6 USCMA 601, 606, 20 CMR 317:

". . . On the other hand, unless made in the regular course of business and independently entitled to admission on that ground, a memorandum of past recollection recorded must be based on the entrant's personal knowledge of the correctness of the facts. United States v Keppler, 1 F2d 315 (CA3d Cir) (1924). Otherwise it requires identification by the informant, as well as the entrant, before it may be admitted as a memorandum of past recollection recorded. City of New York v Second Ave. R. Co., 102 NY 572, 7 NE 905; Annotation, 125 ALR 19, at page 150."

The Government seeks comfort from this statement but, as we will see, it is misinterpreted. An examination of the cases in which a memorandum established by composite testimony has been admitted in evidence will show the courts expressly based their opinions on the proposition that the memorandum had been prepared in the regular course of business, or that a factual pattern of that nature was involved. To illustrate the point we refer to several such cases. In City of New York v Second Ave. R. Co., 102 NY 572, 7 NE 905 (1886), which we mentioned in the above quotation, a foreman in general charge of certain work made entries based upon information given him by subordinate gang foremen. While the overseer had no personal knowledge of

278

the facts related by his subordinates, he stated he correctly recorded the information reported to him. The gang foremen did not see the entries, but testified they had correctly reported the facts to their superior. None of those parties had any present recollection of the facts. Under those circumstances, the Court of Appeals of New York held that, although such a memorandum was not admissible upon the testimony of either the general foreman or his subordinates, separately considered, the combined evidence from both sources supplied the proper predicate for admitting the entries. But the court went on to say:

"We are of opinion, however, that it is a proper qualification of the rule admitting such evidence that the account must have been made in the ordinary course of business, and that it should not be extended so as to admit a mere private memorandum, not made in pursuance of any duty owing by the person making it, or when made upon information derived from another who made the communication casually and voluntarily, and not under the sanction of duty or other obligation. The case before us is within the qualification suggested." [7 NE at page 909.]

Other courts have rationalized in a similar vein. Thus, in Murray & Peppers v Dickens, 149 Ala 240, 42 So 1031, 1032 (1906), the Supreme Court of Alabama, faced with a similar problem, stated:

". . . [T]he testimony . . . shows that the entries were regularly made in a book kept for that purpose, on the reports which were made, in accordance with the requirements of the contract; . . . [W]hile it is true that the expression is found in the authorities that the person making the entry must have knowledge of the correctness of the item, yet it will be found that in those cases there was no proof by any one else of the correctness of the item, and it would seem, on reason, that if one party testifies that he knew of the correctness of the item and gave it correctly to the other, and the other testifies that he entered it as it was given to him, that that would amount to the same thing as if the party who made the entry should swear that he knew of the correctness of the item. So it is laid down that 'entries made by a party from data furnished, or memoranda kept by an employé to assist his memory in making a report or return will be admissible, if supplemented by the oath of the party and the testimony of the servant making the memoranda or furnishing the information.' "

And in Lawn v Prager, 67 Wash 568, 121 Pac 466 (1912), confronted with facts of like posture, the Washington Supreme Court held:

". . . These entries . . . were made . . . in accordance whith [sic] a general custom and course of business pursued by respondents in keeping their accounts of extra work performed by their employés upon this and other contracts which they had; they being general building contractors. The foreman testified to the correctness of the slips turned in by him to respondent Lawn, though at the time of the trial the slips kept by himself had been lost. The data contained in these slips was all within his personal knowledge; that is, they were merely memoranda made by himself of facts within his own knowledge. So his testimony went to the extent of showing that he furnished to respondent Lawn correct data. Respondent Lawn testified to the correctness of the recording of that data by him in this book. Hence we have no hearsay evidence here. Under the circumstances shown, we think this book was admissible in evidence. While it required the testimony of both of these witnesses to verify the correctness of the original data and the correctness of the record thereof in this book, so far as the admissibility of this book is concerned, it is in principle the same as if we had but one witness with knowledge of the original transactions, and also knowledge that they were correctly recorded in this book."

**279**

And the court went on to state, in distinguishing one of its prior decisions:

". . . A reading of that case will show, however, that the book entries sought to be introduced in evidence were made from data, the correctness of which was not vouched for by any witness nor by any correct legal method whatever. They were not made by one who had knowledge of the original transaction, nor made from data which had been collected or noted by any one in the due course of business."

See also Miller v Shay, 145 Mass 162, 13 NE 468 (1887); Curtis v Bradley, 65 Conn 99, 31 Atl 591 (1894); Johnson's Adm'r v Pigg, 242 Ky 631, 47 SW2d 63 (1932); United States v Allied Stevedoring Corp., 241 F2d 925 (CA2d Cir) (1957).

The same general principle is espoused by writers, but again the illustrations used and the cases cited to support the statement of law are those involving mercantile convenience and necessity. Professor McCormick, in his Handbook of the Law of Evidence, in considering the admissibility of jointly prepared memoranda, states the proposition in this language:

"A second instance of co-operative reports occurs when a person, who may be known as R, reports orally the facts known to him, and another person, W, writes down a memorandum of the oral report. In commercial practice, this is familiarly seen when the salesman or time-keeper reports sales or time to the bookkeeper. Here the record comes in when R swears to the correctness of his oral report (though he may not remember the detailed facts) and W testifies that he faithfully transcribed the oral report." [McCormick on Evidence, § 279, page 594.]

A similar concept may be found in Dean Wigmore's treatise. He states the following rule:

"If a copy by another person of a statement originally written is receivable, why is not a copy receivable of a *statement originally oral?*

The situation is the same as in the preceding instance, except that here the salesman, workman, or foreman, instead of handing the bookkeeper or clerk a written statement of the transaction, makes an oral statement, which is then and there copied as before. Here the salesman will on the stand testify that the statement made by him was an accurate embodiment of his recollection; while the bookkeeper will verify the correctness of his entry,—which is none the less in fact a copy, though it reproduces an oral statement. To receive the memorandum supported by the joint testimony of the two is in perfect accord with legal principle, and is certainly demanded by all considerations of mercantile convenience." [Wigmore, Evidence, 3d ed, § 751.]

We have gone to some length to establish the proposition that when a memorandum could qualify under the business entry rule, the position taken by the Government could be supported. But here the facts are different and we are presented with an isolated transaction which lacks the trustworthiness of book entries. We believe that had the instant situation existed in the above-cited cases, a contrary conclusion would have resulted. In this connection, it is to be remembered that we are considering an exception to the rule of evidence concerning hearsay. Therefore, we must determine whether the principles which, for business reasons, require that an exception be made, are present in this instance.

Historically, the exception was adopted because the necessities of business life demanded some relaxation of the strict rule barring hearsay evidence. Accordingly, business entries which were circumscribed by certain guarantees of trustworthiness were held to be admissible. Dean Wigmore, in § 1522 of his treatise, supra, has this to say about the circumstantial probability of trustworthiness of those entries:

". . . In the typical case of entries made systematically and habitually for the recording of a course of

230

business dealings, experience of human nature indicates three distinct though related motives which operate to secure in the long run a sufficient degree of probable trustworthiness and make the statements fairly trustworthy:

"(1) The habit and system of making such a record with regularity calls for accuracy through the interest and purpose of the entrant; and the influence of habit may be relied on, by very inertia, to prevent casual inaccuracies and to counteract the possible temptation to mis-statements. . . .

"(2) Since the entries record a regular course of business transactions, an error or mis-statement is almost certain to be detected and the result disputed by those dealing with the entrant; mis-statements cannot safely be made, if at all, except by a systematic and comprehensive plan of falsification. . . .

"(3) If, in addition to this, the entrant makes the record under a duty to an employer or other superior, there is the additional risk of censure and disgrace from the superior, in case of inaccuracies,—a motive on the whole the most powerful and most palpable of the three."

Those motives are not present in the case at bar. That is not to say that the witnesses may not have been testifying to the true situation, for the soldiers were unaware of the Lieutenant's purpose in obtaining the information and were under at least some moral persuasion to comply with his request. Further, we would be closing our eyes to reality if we did not recognize that the very sequence of serial numbers that was obtained is some indication of the accuracy of the memorandum. But hearsay testimony is not admissible merely because it may turn out to be true. As previously suggested, this exception is born in necessity because commercial transactions may pass through many hands, and it would be virtually impossible to obtain the testimony necessary to establish each step of dealings in commerce. Moreover, business entries support the most important undertakings of industrial and mercantile life and, if they are sufficiently trustworthy for that purpose, they ought to be acceptable as competent evidence of the transactions they reflect. But isolated personal transactions lack that inherent reliability and are of a different sort. There is no necessity for their admission and, if this particular memorandum—which involves merely serial numbers—is admissible, then there is no end to the admissibility of private recordations as to which there are not even the indicia of accuracy present in the case at bar. Any third party could make a record of a conversation and the recorder could testify if the transactor could not remember. Such a rule would effectively eat away the very essence of the hearsay rule without the guarantees essential to trustworthiness.

In breaking the principle involved into separate parts, we believe we can point out clearly why the procedure here does not meet the rules governing admissibility. The memorandum admitted in evidence established the serial numbers of the bills purportedly paid to the victim. This document embodied the Lieutenant's testimony. For that purpose, it was merely a substitute to take the place of oral statements by the officer. Had he remembered the numbers, the memorandum would have been inadmissible. Therefore, we can apply the same rule to both the memorandum and the suppositious case of the officer being able to recall the numbers. In both instances, the evidence would merely establish that the officer was told by third persons the information which is the core of the prosecution's case. The effective witness is each soldier who saw the numbers on the bills, but none of them made a memorandum and they do not remember. Accordingly, the Lieutenant is merely a conduit through which the Government sought to prove the impressions of the soldiers who saw the numbers. They did not offer their assertions from the witness stand as they were only given over the telephone to the officer. If that is permissible, then any out-of-court statement which fixes the impressions of a witness can be

testified to by a third party if the effective witness does not remember. At best, then, we only have written evidence of what someone else stated to be a fact and it is used not merely to show the incident occurred but to prove the truth of what was said. In regular business entries, we bridge the hearsay gap by an exception which is acceptable for the reasons we have outlined. But there is nothing in the case at bar which gives any reasonable assurance that possible deficiencies, suppressions, sources of error, or untrustworthiness have been guarded against. On the contrary, the assertions of the effective witness are well protected from being weakened by cross-examination, and there is no substitute to offset the loss of that guarantee of trustworthiness.

One word concerning the necessity for carving out another exception to the hearsay rule will suffice. In this situation, there is no necessity as such is understood in the law. This was essentially a private transaction, and the dichotomy could have been prevented by one of two simple expedients. Either the soldiers could have recorded their impressions or the officer could personally have compared the serial numbers on the currency with those he recorded in his memorandum. Then the testimony could have been presented firsthand by the witness making the assertion and the Government would not have been required to call a number of witnesses to prove a simple transaction. From this, it necessarily follows that failure to preserve testimony properly is the only reason for the prosecution's dilemma. That does not support a theory that an exception to the hearsay rule should be made, lest society be severely but unnecessarily handicapped by strict evidentiary rules.

The decision of the board of review is affirmed.

Judge FERGUSON concurs.

QUINN, Chief Judge (dissenting):

Perhaps better means of recording the serial numbers on the bills could have been used, but that is not the question before us. What we are concerned with is the admissibility of the evidence resulting from the means used. The majority concede that the list of the numbers would have been admissible if made in the regular course of business, but since it was not so made they say it is inadmissible. Whatever validity the conclusion may have as to a report by A to B, in which A has personal knowledge of the facts, but does not verify the inclusion of the facts in the writing prepared by B, it has no application to this case. Cf. Morgan, The Relation Between Hearsay and Preserved Memory, 40 Harvard Law Review 712, 727–728 (1926–1927).

The enlisted men who reported the numbers on the bills to Lieutenant Cerini did not simply recite the numbers to him; nor did he simply record the numbers as read to him. Additionally, the lieutenant *read off the numbers from his list and each person who made the report checked the numbers against the numbers on his bills and verified their correctness*. The verification made the lieutenant's list as authentic as a list actually prepared by each enlisted man. There is, therefore, no gap between what was reported and what was recorded. And the situation is the same as that in which a person having knowledge of the facts personally makes or sees the record. See Kinsey v State, 49 Ariz 201, 65 P2d 1141. In that situation, as in this case, there is verification of the correctness of the entry by the "informant, as well as the entrant." United States v Bergen, 6 USCMA 601, 20 CMR 317.

I would answer the certified question in the negative, and reverse the decision of the board of review.