633 P.2d 398

**STATE of Arizona, Appellee,**

**v.**

**Ralph HALL and Richard Hagen, Appellants.**

**Nos. 4727, 4728.**

Supreme Court of Arizona, In Banc.

July 21, 1981

Rehearing Denied Sept. 10, 1981.

[redacted]

Robert K. Corbin, Atty. Gen., by William J. Schafer, III, Georgia B. Ellexson, Asst. Attys. Gen., Phoenix, for appellee.

William Craig Haus, Apache Junction, for appellant Ralph Hall.

James Quisenberry, Casa Grande, for appellant Richard Hagen.

STRUCKMEYER, Chief Justice.

Appellants, Ralph Hall and Richard Hagen, were convicted of first degree murder and first degree conspiracy. They were sentenced to concurrent terms of life imprisonment on the murder charge and ten to twenty-five years on the conspiracy charge and appeal. Affirmed.

Appellants and the deceased, Robert Phillips, were inmates at the Arizona State Prison. On November 1, 1977, appellant Hall and another member of a prison group called "Bad Company" were standing outside the door to a prison dormitory. Inside the dormitory, appellant Hagen, also a member of "Bad Company", struck Phillips twice in the head with an eight-pound pipe used as a bar on a weight lifting machine. Hagen then walked to the door and, without speaking, handed the pipe to Hall. Hall took the pipe to the weight area, where he washed it, wiped it off with a red handkerchief and placed it on the weight machine. When Phillips was found, he was taken to Maricopa County Hospital. He was comatose and unresponsive to all but "deep pain" stimuli, such as pressure applied to the breast bone. An examination revealed a large scalp laceration, a fractured skull and three fractured fingers. All neurological signs indicated brain damage.

Phillips was confined to the Intensive Care Unit for about ten days, where he remained unconscious and unresponsive to any stimuli less than deep pain. On the eighth day, he regained consciousness and began to move his limbs. He also began to verbalize, but nothing he said was intelligible. Later Phillips was transferred out of the Intensive Care Unit, and near the end of two weeks he could move about, but only when assisted by someone else. His ability to communicate or to move about was never

normal and he was never considered fully recovered, even though he had made some progress toward recovery.

On November 28, Phillips was found dead on the floor of his hospital room. An autopsy disclosed he had died from a large pulmonary embolism, a blood clot, that blocked both arteries into his lungs. The embolism's source was a thrombosis in his right femoral vein located in the right groin area. Seemingly the clot broke off the vein's wall, traveled through the vein to the heart and then to the arteries of the lung.

On December 30, Hagen was segregated from the rest of the prison population and placed in investigative lockup. Hall was placed in investigative lockup on March 27, 1978. Indictments were returned against them on July 25, 1978. Because of the delay between investigative lockup and indictment, appellants urge that their rights to counsel, to a speedy trial, and to due process were violated.

Appellants' argument that they were denied counsel is plainly without merit. The "right to counsel attaches only at or after the time that adversary judicial proceedings have been initiated * * *." *Kirby v. Illinois*, 406 U.S. 682, 688, 92 S.Ct. 1877, 1881, 32 L.Ed.2d 411 (1972). There is no right to counsel prior to indictment. *State v. Flynn*, 109 Ariz. 545, 514 P.2d 466 (1973). No issue has been raised as to representation at interrogations during confinement. See *Edwards v. Arizona*, —— U.S. ——, ——, n. 7, 101 S.Ct. 1880, 1882, n. 7, 68 L.Ed.2d 378 (1981); *Kirby v. Illinois*, 406 U.S. at 687–688, 92 S.Ct. at 1881 (1972).

The constitutional right to a speedy trial attaches on "arrest". *United States v. Marion*, 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971). The same is true as to the speedy trial requirement of Rule 8.2(a), Rules of Criminal Procedure, 17 A.R.S. The idea that appellants' "arrest" occurred when they were placed in investigative lockup is without merit. A prison inmate placed in segregation or investigative lockup is not under "arrest" for speedy trial purposes. The right in that context

attaches only upon indictment. *United States v. Clardy*, 540 F.2d 439 (9th Cir. 1976); *Aldridge v. State*, 602 P.2d 798 (Alaska 1979); see *United States v. Smith*, 464 F.2d 194 (10th Cir. 1972). In *Aldridge*, the prison inmate was observed holding a spoon over a book of burning matches and picking up an item believed to be a syringe. He was interrupted and almost immediately placed in a maximum security unit where he was subjected to a body search and questioning. Blood and urine samples were taken. It was held the inmate's right to a speedy trial attached a month and one-half later, after his indictment for possession of heroin. In so holding, the Alaska Supreme Court quoted the Ninth Circuit Court of Appeals in *United States v. Clardy*, supra:

 "'Both appellants contend that the failure to commence trial sooner deprived them of their speedy trial rights under the Sixth Amendment. That right assertedly attached when appellants were *de facto* arrested by being placed in segregated confinement after the attack. However, such discipline is not an "arrest" for speedy trial purposes. [Citation omitted.] The identifying indicia of a *de facto* arrest sketched in *United States v. Marion*, 404 U.S. 307, at 320, 92 S.Ct. 455, [at 463] 30 L.Ed.2d 468 (1971), are for the most part absent here. The prison discipline did not focus public obloquy upon appellants, did not disrupt their "employment" or drain appellants' financial resources. In short, it was not a public act with public ramifications, but a private act. Actual physical restraint may have increased and free association diminished, but unless we were to say that imprisonment *ipso facto* is a continuing arrest, these criteria bear little weight in the peculiar context of a penal institution where the curtailment of liberty is the general rule not the exception. Thus, speedy trial rights did not come into play until April 1, 1975, when appellants were indicted, * * *.'" *Aldridge v. State*, supra at 800–801.

For pre-indictment delay to violate due process, the appellants must show that the delay was intended to gain a tacti-

cal advantage or to harass them and that the delay actually and substantially prejudiced them. *State v. Torres*, 116 Ariz. 377, 569 P.2d 807 (1977); see *United States v. Lovasco*, 431 U.S. 783, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977); *United States v. Henry*, 615 F.2d 1223 (9th Cir. 1980); *United States v. Clardy*, supra at 442. Appellants point to a general unavailability of witnesses but they do not specify what information was lost to them by reason of delay. Only one "missing" witness is singled out, Phillips' roommate at the hospital, but even here there is no assertion that this person had exculpatory information. In *State v. Torres*, supra, we said:

"A mere assertion of the unavailability of an eyewitness is insufficient to show that a denial of due process has occurred." *Id.* 116 Ariz. at 379, 569 P.2d 807.

Nor do the facts establish that the delay was intended to gain a tactical advantage or to harass appellants. Instead, appellants argue only that it is unfair for the State to investigate and gather statements and evidence which they did not or could not do until their indictment; hence, they were afforded a "stale investigation." Such is clearly not constitutionally violative of due process. *United States v. Lovasco*, 431 U.S. at 795–796, 97 S.Ct. at 2051–2052; *United States v. Clardy*, supra at 442; *cf. State v. Torres*, supra (delay intended to protect undercover officer's identity). In *United States v. Lovasco*, the Supreme Court said:

"In our view, investigative delay is fundamentally unlike delay undertaken by the Government solely 'to gain tactical advantage over the accused,' *United States v. Marion*, 404 U.S. at 324, 92 S.Ct. at 465, precisely because investigative delay is not so one-sided. Rather than deviating from elementary standards of 'fair play and decency,' a prosecutor abides by them if he refuses to seek indictments until he is completely satisfied that he should prosecute and will be able promptly to establish guilt beyond a reasonable doubt. Penalizing prosecutors who defer action for these reasons would subordinate the goal of 'orderly expedition' to

that of 'mere speed,' (citation omitted). This the Due Process Clause does not require. We therefore hold that to prosecute a defendant following investigative delay does not deprive him of due process, even if his defense might have been somewhat prejudiced by the lapse of time." 431 U.S. at 795–796, 97 S.Ct. at 2051–2052 (footnote omitted).

Appellants question the sufficiency of the evidence to support the conclusion that their acts were the proximate cause of Phillips' death. On appeal, the issue is not whether we are convinced of appellants' guilt beyond a reasonable doubt, but whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). *Accord, State v. Raymond Curtis Tison*, 129 Ariz. ——, 633 P.2d 355 (1981). In making this determination, *all* evidence and the inferences from it are viewed in the light most favorable to sustaining the verdict. *Jackson v. Virginia*, supra; *State v. Childs*, 113 Ariz. 318, 553 P.2d 1192 (1976); *State v. Bearden*, 99 Ariz. 1, 405 P.2d 885 (1965); *State v. Mathis*, 92 Ariz. 194, 375 P.2d 388 (1962).

When viewed in this light, these facts are disclosed. If a patient remains in bed for a lengthy period of time, there is an increased incidence of bloodclotting in the leg veins, medically known as thrombophlebitis or thrombosis. The increased incidence of clotting results from sluggishness of the blood due to decreased muscle activity necessary for the passage of blood through the veins. Also, after an injury the blood tends to clot or coagulate more readily.

The usual remedies for thrombosis are exercise and the use of an anticoagulant. The latter was not used in Phillips' case because there was internal bleeding in the brain. Exercise was delayed because Phillips was comatose for eight days and did not move from his bed for two weeks after his admission to the hospital. Even though Phillips was mobile in the last few days

before his death, the testimony was that mobility during the last days of Phillips' hospitalization would have no bearing on the cause of death.

 Appellants argue that one who injures or wounds another in a manner not calculated to endanger life is not guilty of homicide where death results solely from an independent cause. While this proposition is undoubtedly true, it has no application here. Under the court's instruction that one element of murder is the specific intent to kill, the jury necessarily found, and the evidence supports such a finding, that appellants injured Phillips in a manner calculated to endanger his life. Even though the result intended by appellants was achieved in an unintended manner, appellants' actions may still have been a proximate cause of Phillips' death. The wounds inflicted need not have been fatal or even the direct cause of death. It is sufficient if the wounds caused death indirectly through a chain of natural effects and causes unchanged by human action. *Drury v. Burr,* 107 Ariz. 124, 126, 483 P.2d 539 (1971); see *State v. Powers* 117 Ariz. 220, 571 P.2d 1016 (1977); *State v. Drury,* 110 Ariz. 447, 520 P.2d 495 (1974). This is true even though the death-causing condition was anatomically disassociated from the wound inflicted. See *State v. Swiger,* 5 Ohio St.2d 151, 34 Ohio Op.2d 270, 214 N.E.2d 417 (1966). Appellants would not be a proximate cause of Phillips' death if the chain of natural effects and causes was either non-existent because of or broken by intervening events which were unforeseeable and hence were superseding events. See *State v. Fierro,* 124 Ariz. 182, 603 P.2d 74 (1979); *State v. Powers,* supra; see generally, *State v. Spates,* 176 Conn. 227, 405 A.2d 656, 660 (1978).

In dealing with cases where the intended death was achieved in an unintended manner because of an intervening event, courts usually distinguish cases where the intervening event was a coincidence from cases where the intervening event was a response

to the defendant's prior actions. LaFave, *Criminal Law* § 35, pp. 257–261; cf. Perkins, *Criminal Law,* pp. 618–621 (distinguishing independent events from dependent events).

"An intervening act is a *coincidence* when the defendant's act merely put the victim at a certain place at a certain time, and because the victim was so located it was possible for him to be acted upon by the intervening cause.

<p style="text-align:center">* * * * * *</p>

By contrast, an intervening act may be said to be a *response* to the prior actions of the defendant when it involves a reaction to the conditions created by the defendant. * * * But, while a response usually involves human agency, that is not necessarily the case * * *." LaFave, *Criminal Law* § 35, pp. 257–258.

 A defendant's actions may still be a proximate cause of death regardless of the type of intervening act that occurred, but as "common sense would suggest, the perimeters of legal cause are more closely drawn when the intervening cause was a matter of coincidence rather than response." *Id.* Hence an intervening cause that was a coincidence will be a superseding cause when it was unforeseeable. *Id.*; see, e.g., *State v. Powers,* supra. On the other hand, an intervening cause that was a response will be a superseding cause only where it was abnormal *and* unforeseeable. LaFave, *Criminal Law,* supra; see, e.g., *State v. Fierro,* supra; *State v. Drury,* supra; see also, Perkins, *Criminal Law,* supra.

 On identical facts, the Ohio Supreme Court found a defendant's actions to be a proximate cause of death. *State v. Swiger,* supra. Phillips' hospitalization and immobility were caused by blows to the head delivered by appellant Hagen with appellant Hall's assistance. A normal response to such immobility is the development of leg vein thrombosis which could result in a pulmonary embolism. Since the intervening responses of thrombosis and

pulmonary embolism were not abnormal, appellants' actions were a proximate cause of Phillips' death. *Accord, Commonwealth v. Cheeks*, 423 Pa. 67, 223 A.2d 291 (1966), cited in *Drury v. Burr*, supra; *Commonwealth v. Cartagena*, 272 Pa.Super. 485, 416 A.2d 560 (1979).

 Appellant Hagen argues his conspiracy conviction must be reversed because there is not sufficient evidence of an agreement to achieve an unlawful object. We do not agree. The unlawful agreement can be inferred from the parties' overt conduct. *State v. Estrada*, 27 Ariz.App. 38, 550 P.2d 1080 (1976). The jury could have inferred a pre-existing agreement from the facts that Hagen assaulted Phillips while Hall, a member of a prison group to which Hagen belonged, stood by the door warning other inmates not to enter the dormitory, and that Hall returned the pipe to the weight lifting area without any conversation between them.

 Appellants urge that a new trial should have been granted because a juror submitted an affidavit stating he held a reasonable doubt as to appellants' guilt but agreed to the guilty verdict since "as the night wore on, I was under increased pressure to agree with the majority."

As to this, Arizona does not follow the strict majority rule prohibiting a juror from impeaching a verdict. Instead, a juror may testify on a motion for new trial that certain specified misconduct occurred. Rules 24.1(c)(3) and 24.1(d), Arizona Rules of Criminal Procedure, 17 A.R.S.; Note, "Impeachment of Jury Verdicts in Arizona", 21 Ariz.L.Rev. 821, 829–830 (1979). But to protect the integrity of the verdict and the privacy of the jury's deliberations, only the misconduct set forth in Rule 24.-1(c)(3) provides grounds for a new trial, see *State v. Callahan*, 119 Ariz. 217, 580 P.2d 355 (App.1978). Evidence which inquires into the subjective motives or mental processes of a juror is inadmissible under the explicit wording of Rule 24.1(d). Ap-

pellants acknowledge that the juror's statements concerning his doubts as to their guilt is not embraced within the purview of Rule 24.1(c)(3). The affidavit is a statement of the juror's subjective motives. See *Johnson v. State*, 33 Ariz. 354, 264 P. 1083 (1928); *State v. Melcher*, 15 Ariz.App. 157, 487 P.2d 3 (1971). The trial court did not err in rejecting appellants' request for a new trial.

Affirmed.

HOLOHAN, V.C.J., and HAYS, CAMERON and GORDON, JJ., concur.