709 P.2d 1336

**STATE of Arizona, Appellee,**

v.

**Secundino COCIO, Appellant.**

No. 6232.

Supreme Court of Arizona,
En Banc.

Nov. 7, 1985.

Robert K. Corbin, Atty. Gen., William J. Schafer, III, Chief Counsel, Criminal Div., Jack Roberts, Asst. Atty. Gen., Phoenix, for appellee.

L. Anthony Fines, Robert Hirsh, Tucson, for appellant.

GORDON, Vice Chief Justice.

After a jury trial, defendant, Secundino Barcelo Cocio, was convicted of one count of manslaughter and one count of driving while under the influence of intoxicating liquor. The jury found the manslaughter charge to be dangerous and committed while defendant was on probation and also found that defendant had one prior conviction. Since defendant committed the dangerous manslaughter offense while he was on probation, the trial court sentenced defendant to life imprisonment pursuant to A.R.S. § 13–604.01 (renumbered A.R.S. § 13–604.02 May 16, 1985. However, the designation A.R.S. § 13–604.01 will be used in the remainder of this opinion). We have jurisdiction under Ariz. Const. art. 6, § 5(3) and A.R.S. § 13–4031.

On March 23, 1983, defendant's truck collided with a car, driven by Johnny Rodriguez, at the intersection of 44th Street and 10th Avenue in Tucson. A passenger in the Rodriguez vehicle was killed during the collision. Shortly after the accident, officers at the scene spoke with defendant and opined that defendant was driving while intoxicated. Thereafter, defendant was taken to Kino Hospital for treatment.

While defendant was being treated, a hospital medical technician drew blood from defendant pursuant to a doctor's order. The police obtained some of this blood, which subsequent tests revealed to have a blood alcohol level of .28. A sample of defendant's blood was also tested by the hospital resulting in an alcohol level of .29.

Defendant raises several issues on appeal:

(1) Whether the trial court erred in failing to excuse a juror for cause.

(2) Whether the court erred in instructing the jury on causation.

(3) Whether the mandatory life sentence on the manslaughter charge violated the eighth and fourteenth amendments to the United States Constitution.

(4) Whether the warrantless seizure and testing of defendant's blood sample by the police violated the fourth amendment to the United States Constitution and article II, § 8 of the Arizona Constitution.

(5) Whether the trial court erred in admitting the results of a blood alcohol test performed by Kino Hospital.

I

Defendant argues that the trial court should have excused for cause venireman Goodman because she expressed strong feelings about people who drive while intoxicated.

VENIREMAN GOODMAN: "That's okay.

I have just some real strong feelings against drinking, drinking and driving, and I don't know whether—if that would interfere with this case or not."

Defense counsel made a motion to strike for cause venireman Goodman based on this statement.

The determination of whether to excuse a juror for cause is within the sound discretion of the trial court and should not be disturbed on appeal absent a clear showing

of abuse. *State v. Reinhold*, 123 Ariz. 50, 597 P.2d 532 (1979). To establish an abuse of discretion defendant must show that the juror was biased such that he or she could not render a fair or impartial verdict. *State v. Rose*, 121 Ariz. 131, 589 P.2d 5 (1978). We find no abuse of discretion for several reasons.

A statement by a juror of strong feelings about a case or type of crime does not, without more, demonstrate that the juror is biased. *State v. Caldwell*, 117 Ariz. 464, 573 P.2d 864 (1977); *State v. Brady*, 66 Ariz. 365, 189 P.2d 198 (1948). We recognize that it is not unusual today for people to have strong feelings about drinking and driving because drunk driving has become a problem of epidemic proportions throughout the United States. *See State v. Superior Court*, 143 Ariz. 45, 691 P.2d 1073 (1984). Furthermore, the record of the voir dire proceeding reflects that Goodman could set aside her concerns and sit on a drunk driving manslaughter case impartially:

> "THE COURT: Do you think you could sit with a fair and open mind?
>
> VENIREMAN GOODMAN: Well, I don't know. Probably yes. I just—depends.
>
> THE COURT: It's not a question of possible. We want Jurors who—
>
> VENIREMAN GOODMAN: I don't know what it's about. I don't know. If it's robbery, it's very similar to the one that I was involved with, and maybe not, but then I don't know what this is.
>
> THE COURT: The charge is—
>
> VENIREMAN GOODMAN: I can't tell you whether it was or wasn't.
>
> THE COURT: The charges are not robbery, and I can tell you that.
>
> My next series of questions may involve that.
>
> The charges are manslaughter and driving while under the influence of intoxicating liquor. Those are the two charges.

And I'll put the question to you again. *Do you think you can sit with a fair and open mind?*

> VENIREMAN GOODMAN: *Yes.*
>
> THE COURT: On that trial?
>
> VENIREMAN GOODMAN: Yes." (emphasis added)

 The trial court, after considering Goodman's entire voir dire examination, did not think she was biased. The trial court decides whether a juror's opinion is fixed and will influence her decision; that determination depends in large part upon the observation of a prospective juror's demeanor and tenor of her answers. *State v. Munson*, 129 Ariz. 441, 631 P.2d 1099 (App. 1981). Since the trial judge has the opportunity to observe the jurors firsthand, he has a more immediate grasp of the jurors' feelings and can better assess the jurors' bias. *See State v. Chapple*, 135 Ariz. 281, 296, 660 P.2d 1208, 1224 (1983). The trial judge opined that Goodman's "strong feelings" were not so rigidly held to prevent the juror from fairly evaluating the evidence:

> "THE COURT: And let the record indicate otherwise her emotional response was not accompanied by tears or jestures [sic] or anything—for the record, I'd like to say I don't think it was an emotional response or perhaps I would have questioned her further.
>
> The motion at this time is denied."[1]

In this case, where the trial judge's decision appears to be rationally based, we will not substitute our judgment for hers. We find no abuse.

## II

 Defendant next argues that the trial judge erroneously gave the following "sole cause" instruction:

> "The unlawful acts of two or more people may combine to cause the death of another. In order for the unlawful act

---

1. We also note that defense counsel did not request any further questions be asked.

of one such person to be a defense to the criminal liability of the other, the unlawful act of the one must have been the sole cause of death."

Defendant complains that this "sole cause" instruction is inconsistent with the other instructions given, and that an instruction based on A.R.S. § 13–203(C)(2) should have been given *sua sponte* by the trial judge. We disagree. The instructions when read together, as they must be, are consistent. *See State v. Bracy*, 145 Ariz. 520, 703 P.2d 464 (1985) (instructions must be considered as a whole); *Kinsey v. State*, 49 Ariz. 201, 65 P.2d 1141 (1937) (accord).

The proximate cause requirement is set out in the manslaughter instruction given by the trial court: The instruction on manslaughter (# 6) reads:

"A person commits manslaughter by recklessly causing the death of another person.

Recklessly causing the death of another person means that a person is aware of and consciously disregards a substantial risk that his conduct will result in the death of another person.

The risk must be such that disregarding it is a gross deviation from what a reasonable person would do in a situation.

It is no defense that a person who creates such a risk is unaware of it if the reason he is unaware of it is solely because of voluntary intoxication."

This instruction was derived from A.R.S. §§ 13–1103 and 13–105 and accurately defines manslaughter. The court also gave a general causation instruction (# 12) to the jury defining proximate cause, intervening cause and superseding cause.

"To warrant a conviction for manslaughter or negligent homicide the death must be the natural and continuous consequence of the unlawful act, and not the result of an independent intervening cause in which the accused does not participate, and which he could not foresee. *If it appears that the act of the accused was not the proximate cause of the death* for which he is being prosecuted, but that another cause intervened, with which he was in no way connected, and but for which death would not have occurred, such supervening cause is a defense to the charge of manslaughter or negligent homicide." (emphasis added)

This instruction accurately sets out the relevant causation principles in Arizona criminal cases. *See State v. Hall*, 129 Ariz. 589, 633 P.2d 398 (1981); *State v. Powers*, 117 Ariz. 220, 571 P.2d 1016 (1977). This causation instruction told the jury that if Rodriguez's act intervened to cause death and such act was not foreseeable by defendant, defendant's acts would not be the proximate cause of the death. Instead, Rodriguez's act would be the proximate cause of death and thus the sole legal cause of death, as the "sole cause" instruction required. The "sole cause" instruction merely required the jury to follow the general causation instruction (# 12) and find that defendant was not the proximate cause of death before he could be relieved of liability. Thus, these causation instructions are not contradictory or inconsistent.

■ Defendant's suggestion that the trial court should have instructed the jury pursuant to A.R.S. § 13–203(C)(2) is also meritless. A.R.S. § 13–203 reads in relevant part:

"§ 13–203. Causal relationship between conduct and result; relationship to mental culpability

A. Conduct is the cause of a result when both of the following exist:

1. But for the conduct the result in question would not have occurred.

2. The relationship between the conduct and result satisfies any additional causal requirements imposed by the statute defining the offense.

\* \* \* \* \* \*

C. If recklessly or negligently causing a particular result is an element of an of-

fense, and the actual result is not within the risk of which the person is aware or in the case of criminal negligence, of which the person should be aware, that element is established if:

1. The actual result differs from the probable result only in the respect that a different person or different property is injured or affected or that the injury or harm intended or contemplated would have been more serious or extensive than that caused; or

2. The actual result involves similar injury or harm as the probable result and occurs in a manner which the person knows or should know is rendered substantially more probable by such person's conduct."

Subsection (A) sets out the basic causation requirements for any crime. Subsection (A)(2) requires any causal requirements of the statute defining the offense, here manslaughter § 13–1105, to be met. In our case, the conduct-result relationship was set out by the manslaughter instruction (# 6) which required that defendant be aware of and consciously disregard a substantial risk that his conduct will result in the death of another person. Subsection (C) of § 13–203 only comes into play when "the actual result is not within the risk of which the person is aware." In the case at bar, the record demonstrates that the risk of which defendant was aware was the oncoming Rodriguez vehicle colliding with his truck. Defendant himself testified that he saw the Rodriguez vehicle coming down the roadway about five seconds before the collision occurred. Defendant also indicated that he did not stop in the left hand turn lane but continued crossing the path of the oncoming Rodriguez vehicle which came at him at a high rate of speed. Thus, an instruction pursuant to A.R.S. § 13–203(C)(2) would have been inappropriate.

### III

■ Defendant also alleges that his sentence violates his right against cruel and unusual punishment under the eighth and fourteenth amendments to the United States Constitution. In determining whether a sentence violates the eighth amendment, the Supreme Court set out a four-prong test in *Solem v. Helm*, 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983). The court must consider (1) the gravity of the offense, (2) the harshness of the penalty, (3) sentences imposed on similarly situated defendants in the same jurisdiction, and (4) sentences imposed for commission of the same crime in other jurisdictions. *Solem v. Helm*, 463 U.S. at 290, 103 S.Ct. at 3010–11, 77 L.Ed.2d at 649–650. *See also State v. Garcia*, 141 Ariz. 97, 685 P.2d 734 (1985) (applying the *Solem v. Helm* test).

We believe the crime was sufficiently grave to warrant severe punishment. This was a senseless crime that led to a needless death, which cannot be considered a nondeliberate act as defendant contends. Defendant was aware of the risk at the time he consumed the mass quantities of alcohol, leading to his .28 blood alcohol level. He knew his driving would be impaired such that his vehicle would become a dangerous even possibly deadly instrument to others. *See State v. Bravo*, 131 Ariz. 168, 639 P.2d 358 (App.1981) (where culpable mental state is "recklessly", voluntary intoxication not considered defense). A.R.S. § 13–1103(A)(1); A.R.S. § 13–105(5)(C); *see also* La Fave & Scott, Criminal Law § 45, p. 345–46 (1972) (defendant realized risk to others of his getting drunk).

The gravity of the offense is also exemplified by the terrible toll taken in lives by drunk drivers. Indeed about seventy persons a day are killed by drunk drivers in our nation and over 25,000 per year. *See State v. Superior Court, supra; State ex rel. Ekstrom v. Superior Court*, 136 Ariz. 1, 663 P.2d 992 (1983) (Feldman, J. specially concurring); Allstate, *The Drunk Driver May Kill You*. This Court in *Noland v. Wootan*, 102 Ariz. 192, 193, 427 P.2d 143, 144 (1967) took "judicial notice of the terrible toll taken, both in personal injuries and

property damage, by drivers who mix alcohol and gasoline." Drunk driving has become a problem of epidemic proportion in Arizona and other states throughout the country, and must be effectively dealt with to satisfy the public outcry against this crime. *See State v. Superior Court, supra; State v. Deskins,* 234 Kan. 529, 673 P.2d 1174 (1983) (problem of drunk driver one of enormous magnitude); *State v. Coccomo,* 177 N.J.Super. 575, 427 A.2d 131 (1980).

Second, the sentence imposed on defendant in this case was not unduly harsh. Defendant was a repeat offender and utilized a dangerous instrument during the commission of the crime. This Court in *State v. McNair,* 141 Ariz. 475, 687 P.2d 1230 (1984) upheld a life imprisonment sentence imposed pursuant to § 13–604.01 based on the severity of these two factors:

"Repeat offenders have typically received more severe sentences than first offenders. Likewise, dangerous offenders have received more severe sentences than those who are considered non-dangerous. A.R.S. § 13–604. In light of the fact that the offense was committed while on probation, a life sentence is not unduly harsh. * * *." (citations omitted) 141 Ariz. at 484, 687 P.2d at 1239.

Furthermore, where the legislature has prescribed the appropriate punishment, we will not determine whether the sentence is fair in our view, or whether we would impose the same sentence. *State v. Garcia,* 141 Ariz. at 100, 685 P.2d at 737. As the Court in *McNair* noted, "[r]eviewing courts * * * should grant substantial deference to the broad authority that legislatures necessarily possess in determining the types and limits of punishments for crimes * * *," and "a state is justified in punishing a recidivist more severely than it

punishes a first offender." 141 Ariz. at 484, 687 P.2d at 1239 quoting *Solem,* 463 U.S. at 290, 296, 103 S.Ct. at 3009, 3013, 77 L.Ed.2d at 649, 653.

Third, we believe defendant's sentence is not disproportionate when compared with other sentences imposed on similarly situated defendants in this jurisdiction. Life sentences imposed pursuant to A.R.S. § 13–604.01 have been constitutionally upheld in several Arizona cases. In *State v. Hutton,* 143 Ariz. 386, 694 P.2d 216 (1985), defendant was on probation for a prior felony and was subsequently convicted of manslaughter and sentenced to life imprisonment pursuant to A.R.S. § 13–604.01. We upheld the conviction against defendant's contention that the sentence was cruel and unusual. In *State v. McNair, supra,* defendant was convicted of armed robbery. The trial judge found defendant was on probation at the time the offense was committed and sentenced defendant to life imprisonment without possibility of parole for twenty-five years pursuant to A.R.S. § 13–604.01. We upheld this sentence as constitutional. Two life sentences imposed pursuant to A.R.S. § 13–604.01 were upheld in *State v. Noriega,* 142 Ariz. 474, 690 P.2d 775 (1984), in which defendant was convicted of aggravated assault and first degree burglary with two prior convictions. We note that in these last two cases no death occurred as in this case and, therefore, were less egregious crimes.[2]

Last, defendant's sentence is proportionate with sentences imposed for the same or similar crimes in other jurisdictions. In Alabama a manslaughter conviction with one prior conviction could result in a two- to twenty-five-year sentence, *see* Ala.Code §§ 13A–6–3(a)(2), 13A–5–9 (with two prior convictions ten years to life); in

---

**2.** Defendant attempts to compare his sentence of life imprisonment with the one year probationary sentence received by his co-defendant Rodriguez. Rodriguez, however, was not on probation at the time he committed the offense, as was defendant, and therefore, not subject to

the sentencing mandate of A.R.S. § 13–604.01 as was defendant. Additionally, Rodriguez's sentence was the result of a plea bargain. These sentences cannot be compared as defendants Rodriguez and Cocio are not similarly situated.

Mississippi two to twenty years. *See* Miss. Code Ann. § 97–3–25, –47; *Lester v. State,* 209 Miss. 171, 46 So.2d 109 (1950) (imposing 20-year sentence on defendant convicted of manslaughter for driving truck while drunk and colliding with another car causing death of passenger in other car not cruel and unusual); and in Texas, two to twenty years, Texas Penal Code, art. 19.05, 12.42, 12.34 (Vernon 1974) (with two priors, life imprisonment). These statutes enhance the sentence based on defendant's prior convictions and not on defendant's probationary status and use of a dangerous instrument and are more akin to A.R.S. § 13–604. Other states do not have a statute similar to A.R.S. § 13–604.01. Our Legislature has determined that a defendant who commits a crime during his probationary period is not amenable to rehabilitation and must be dealt with more severely. We find the sentence imposed on defendant in this case constitutional.

## EX POST FACTO LAW

■ Defendant argues that imposition of the life imprisonment sentence pursuant to A.R.S. § 13–604.01 is ex post facto law violative of the United States Constitution art. 1, § 10 and the Arizona Constitution art. 2, § 25.

At the time defendant committed the offense herein, he was on probation for a prior felony conviction for conspiracy. During his probationary period the Legislature enacted A.R.S. § 13–604.01 requiring a life imprisonment sentence if a person is convicted of a felony offense involving the use of a deadly or dangerous instrument while the person is on probation for a conviction of a felony offense. Defendant was sentenced pursuant to the mandate of A.R.S. § 13–604.01 since the manslaughter offense was found by the jury to be a felony of a dangerous nature committed

while defendant was on probation for the first felony conviction. Defendant argues that A.R.S. § 13–604.01 retroactively made his sentence of probation more serious or onerous because if he committed a felony during that probationary period he would face a harsher penalty, life imprisonment.

We recognize that the Arizona Legislature may not enact a law which imposes any additional or increased penalty for a crime after its commission. *Weaver v. Graham,* 450 U.S. 24, 101 S.Ct. 960, 67 L.Ed.2d 17 (1981); *State v. Mendivil,* 121 Ariz. 600, 592 P.2d 1256 (1979). A.R.S. § 13–604.01, however, does not increase defendant's sentence on his *first* conviction. His probationary sentence did not become more onerous. The probationary period did not increase, the conditions of his probation were not changed and his compliance with the conditions was not made more difficult. Additionally, no increased or additional penalty on the crime underlying his probation was imposed due to A.R.S. § 13–604.-01.[3] The enactment of A.R.S. § 13–604.01 in 1982 merely put defendant on notice of the consequences of any further criminal convictions. *See State v. Pendergraft,* 124 Ariz. 449, 604 P.2d 1160 (App.1979) (A.R.S. § 13–604 did not punish defendant for past conduct but merely notified him of increased punishment for future felony); *Gryger v. Burke,* 334 U.S. 728, 68 S.Ct. 1256, 92 L.Ed. 1683 (1948) (enhanced punishment for repeat offenders, not additional penalty for earlier crime but stiffened penalty for latest crime). That a violation of his probation thereafter could lead to a more serious sentence on a subsequent offense does not make compliance with his probationary conditions more onerous. After the enactment of A.R.S. § 13–604.01 defendant was merely required to do what was required of him before its enactment— follow his probationary conditions. We find no ex post facto violations.

**3.** Defendant's reliance on *Gasby v. State,* 429 A.2d 165 (Del.1981) and *State v. White,* 97 Wisc.2d 517, 294 N.W.3d 36 (1979) is misplaced. In both cases the sentence imposed on the violation of his probation was increased by statute requiring a consecutive sentence whereas when defendant was sentenced to probation it could only have been a concurrent sentence.

## IV

### WARRANTLESS SEARCHES

■ Following the collision between the defendant's truck and Rodriguez's vehicle, defendant was taken to the emergency room at Kino Hospital for treatment. During the treatment, a hospital laboratory technician drew blood from defendant pursuant to doctor's orders for medical purposes. Prior to its taking, a police officer requested a portion of the sample pursuant to A.R.S. § 28–692(M).[4] At the time the sample was taken, defendant was not under arrest and a search warrant was not obtained. Defendant argues that the warrantless taking of a blood sample when he was not under arrest violated the fourth amendment to the United States Constitution and article II, § 8 of the Arizona Constitution. We disagree.

The starting point for our analysis is a recognition of A.R.S. § 28–691, Arizona's implied consent law, which ordinarily governs the administration of blood alcohol tests. A.R.S. § 28–691(A) provides in pertinent part:

"A. Any person who operates a motor vehicle within this state gives consent, subject to the provisions of § 28–692, to a test or tests of his blood, breath, or urine for the purpose of determining the alcoholic content of his blood if arrested for any offense arising out of acts alleged to have been committed while the person was driving or in actual physical control of a motor vehicle while under the influence of intoxicating liquor.

. . . ."

A.R.S. § 28–691(D) provides in pertinent part:

"D. If a person under arrest refuses to submit to a test designated by the law enforcement agency as provided in sub-

section A of this section, none shall be given except pursuant to § 28–692, subsection M."

Currently, the legality of the pre-arrest warrantless taking of blood samples from persons suspected of driving while intoxicated is subject to various interpretations in Arizona and throughout the country. In *State v. Waicelunas*, 138 Ariz. 16, 672 P.2d 968 (App.1983), the Court of Appeals held that a blood sample could not be taken without a warrant prior to arrest of a person suspected of driving while intoxicated. In that case the defendant refused on two occasions to take a breathalyzer at the hospital after he was involved in a two-vehicle collision which proved fatal to the other driver. A police officer then requested a treating physician to draw a blood sample over the defendant's objections for police purposes only. The *Waicelunas* court relied heavily on *United States v. Harvey*, 701 F.2d 800 (9th Cir.1983), which held that a blood sample may not be taken from a suspect unless a formal arrest has occurred prior to the seizure. Both cases arose prior to the effective date of A.R.S. § 28–692(M). Both *Waicelunas* and *Harvey* are based on an interpretation of *Schmerber v. California*, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966), which is thought to require an arrest prior to the seizure of a blood sample. Although this position has been followed by a number of courts, see cases cited in 2 W. La Fave, *Search and Seizure* § 5.4(b) n. 18 (1978), we decline to follow this interpretation and hold that a formal arrest of a defendant is not a constitutional prerequisite to the obtaining of a blood sample pursuant to A.R.S. § 28–692(M). *See* 2 W. La Fave, *supra* at n. 19; *People v. Sutherland*, 683 P.2d 1192 (Colo.1984).

The United States Supreme Court in *Schmerber* held that a blood sample may

4. M. Notwithstanding any provision of law to the contrary if a law enforcement officer has probable cause to believe that a person has violated this section and a blood sample is taken from that person for any reason a portion of

that sample shall be provided to a law enforcement officer if requested for law enforcement purposes. A person who fails to comply with this subsection is guilty of a class 1 misdemeanor.

be taken without a search warrant if it is taken in a medically approved manner and based on probable cause to believe the person is intoxicated. In such a situation exigent circumstances permit a warrantless seizure because, "... the percentage of alcohol in the blood begins to diminish shortly after drinking stops, as the body functions to eliminate it from the system." 384 U.S. at 770, 86 S.Ct. at 1835.

■■■ Our interpretation of *Schmerber* and *Cupp v. Murphy*, 412 U.S. 291, 93 S.Ct. 2000, 36 L.Ed.2d 900 (1973), requires us to reach the result that a warrantless removal of blood from a person suspected of violating A.R.S. § 28–692 is permissible per A.R.S. § 28–692(M) if 1) probable cause exists to believe the person has violated A.R.S. § 28–692(A) or (B), 2) exigent circumstances are present and, 3) the blood is drawn for medical purposes by medical personnel. It is our intention to restrict the language in A.R.S. § 28–692(M), "... taken from that person for any reason ..." to mean that the blood must be drawn by medical personnel for any medical reason so as not to conflict with the orderly administration of care to those injured. Under any other circumstances the provisions of A.R.S. § 28–691 apply. This case differs factually from *Waicelunas* in that blood was drawn for medical purposes in the instant case while the blood sample in *Waicelunas* was drawn only for police purposes. Also, the police in the instant case were operating under authority of A.R.S. § 28–692(M) which was not available in the previous case.

■■■ *Cupp v. Murphy, supra,* illustrates that exigent circumstances can justify a search based on probable cause when imminent destruction of evidence is likely and the intrusion is minimal. In *Cupp* the defendant voluntarily appeared at the police station for questioning in connection with the strangulation of his wife. Shortly after defendant's arrival at the station house, the police noticed a dark spot on his finger. Suspecting that the spot might be dried blood and knowing that evidence of strangulation is often found under the assailant's fingernails, the police asked if they could take a sample of scrapings from his nails. The defendant refused, but police proceeded to take a sample which contained traces of skin, blood cells and fabric from the victim's nightgown. The police did not have a warrant and defendant was not under arrest. The police, however, had probable cause to arrest defendant at the time they scraped his fingernails. The United States Supreme Court upheld the search because of the existence of probable cause, the very limited intrusion undertaken incident to the station house detention and the ready destructibility of the evidence.

These three factors in *Cupp* are also present in this case. First, the police had probable cause at the time the blood sample was taken.[5] Second, because of the destructibility of the evidence, exigent circumstances existed. The highly evanescent nature of alcohol in the defendant's blood stream guaranteed that the alcohol would dissipate over a relatively short period of time. *Schmerber v. California, supra.* In fact, the exigent circumstances in this case are even more compelling than *Cupp* since alcohol in a suspect's blood is certain to disappear while the physical evidence on defendant in *Cupp* was only very likely to disappear while a search warrant was obtained.

Finally, as in *Cupp*, the intrusion by the police was minimal. The blood extraction was *not* performed at the request of the police, but pursuant to the orders of the attending physician for medical purposes. Thus, the intrusion by the police in this case was not the needle puncture and the

---

5. Defendant does not contest the existence of probable cause, and after our search of the record for fundamental error, we believe the police had probable cause to arrest the defendant at the time the blood was taken.

insertion of the needle into the vein, but merely a sampling off of an additional portion of the defendant's blood.[6] The bodily intrusion of the needle was performed at the doctor's request for medical purposes. No additional needle puncture was required, and no additional trauma, pain or interference with the medical treatment of defendant was involved. The record shows that the test was performed in a reasonable manner by a trained technician in a hospital environment pursuant to accepted hospital procedure.

Defendant next contends that once the blood is taken and contained in the vial a search warrant must be obtained before the vial can be opened and the sample tested. Defendant likens this case to closed container cases where the police legally seize a container, and must obtain a search warrant before opening the container to determine its contents. *See, e.g., United States v. Place,* 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983) (luggage); *United States v. Chadwick,* 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977) (footlocker could not be opened without search warrant). Such reliance is misplaced. *See United States v. Ross,* 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982). Defendant argues that once the blood is seized, there is no longer danger of the alcohol metabolizing and therefore no exigent circumstances.

Defendant's argument is misplaced. In this case, a closed container was not seized with unknown contents, but instead the contents were the subject of the seizure and thereafter placed in the container; the seizure was not of the vial but the blood. Once physical evidence has been validly seized, it may be tested. *See United States v. Jacobsen,* 466 U.S. 109, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984); *Schmerber v. California, supra; Cupp v. Murphy, supra.* Since the police had probable cause

to suspect defendant was intoxicated while driving, the officers could perform a blood alcohol test on the defendant's blood sample.

## PHYSICIAN PATIENT PRIVILEGE

While defendant was receiving treatment at Kino Hospital, several samples of blood were drawn from him. One blood sample was tested by a Kino Hospital laboratory technician for the alcohol level. The results of this test were introduced at trial over defendant's contention that it violated his physician-patient privilege. Defendant argues that the trial court erred in admitting the blood alcohol test results and asks us to reverse this case based on the alleged error. We agree that the admission of the blood test results was error, *see State v. Santeyan,* 136 Ariz. 108, 664 P.2d 652 (1983), but find that its admission was harmless error.

Unless there is a reasonable possibility that improperly admitted evidence contributed to the conviction, reversal is not required. *Schneble v. Florida,* 405 U.S. 427, 92 S.Ct. 1056, 31 L.Ed.2d 340 (1972). *State v. McVay,* 127 Ariz. 450, 622 P.2d 9 (1980). In this case we believe that the jury would not have found the state's case significantly less persuasive had the Kino Hospital blood alcohol test been excluded. Evidence of defendant's alcohol level was introduced through the sample tested by the state, which revealed a blood alcohol level of .28. The state introduced evidence establishing that the sample was taken in a medically approved manner and properly tested in an accepted procedure. Thus the blood alcohol test performed by the Kino Hospital was merely cumulative.

Evidence of defendant's intoxication was also introduced through the testimony of several officers. Officer Lynch testified that when he spoke to defendant at the

---

**6.** Extraction of blood samples for testing is commonplace in these days of physical exams, and experience with them teaches that the quantity of blood withdrawn is minimal. *See Schmerber v. California, supra.*

scene of the accident, defendant's breath smelled of alcohol, his face appeared flushed, his eyes were bloodshot and pupils dilated and concluded that defendant was under the influence at the time. Officer Slyter, who was also at the scene, testified that as he was talking with defendant he noticed a very strong odor of alcohol coming from defendant's breath and that defendant swayed as he was standing, and opined that defendant was under the influence of intoxicating liquor. Additionally, Officer De Jonge concluded that defendant was under the influence after observing and talking with defendant.

The Kino Hospital blood alcohol test evidence was cumulative and since overwhelming evidence supported defendant's guilt, any error in admission of the evidence was harmless. *See State v. Williams*, 133 Ariz. 220, 650 P.2d 1202 (1982) (erroneous admission of evidence which is entirely cumulative constitutes harmless error); *State v. Wilson*, 113 Ariz. 363, 555 P.2d 321 (1976).

We have reviewed the record for fundamental error, A.R.S. § 13–4035, and have found none. The judgments of conviction and sentences imposed are affirmed.

HOLOHAN, C.J., and HAYS and CAMERON, JJ., concur.

FELDMAN, Justice, dissenting,

I concur with all aspects of the opinion except the discussion of the constitutionality of A.R.S. § 13–604.01 (recently renumbered 13–604.02). In my view, mandatory sentences are constitutional only when tailored to fit narrowly defined, specific offenses and offenders. However, A.R.S. § 13–604.01 covers so broad a range of offenses and offenders that it can be upheld only by ignoring the individualized facts of each case. Thus, for the reasons set out below, and in my special concurrence in *State v. McNair*, 141 Ariz. 475, 687 P.2d 1230 (1984) and dissent in *State v. Garcia*, 141 Ariz. 97, 685 P.2d 734 (1984), I

believe that § 13–604.01 cannot be constitutionally applied to this case.

## THE STATUTE NULLIFIES THE PROPORTIONALITY TEST OF SOLEM.

In my view, § 13–604.01 frustrates the very purpose of the proportionality test articulated by the United States Supreme Court in *Solem v. Helm*, 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983). Proportion is defined as "the relation of one part to another with respect to magnitude, quantity or degree; ...." Webster's Third New International Dictionary 1819 (1968). Accordingly, the *Solem* test envisions an individualized inquiry into the relation of the sentence imposed to the offense and the offender. In *Solem*, the court prefaced its analysis by stating that the question of cruel and unusual punishment cannot be considered in the abstract. 103 S.Ct. at 3008. Although courts should defer to the broad authority of legislatures in determining types and limits of punishments, *"no penalty is per se constitutional."* *Id.* at 3009 (emphasis added). A single day in prison may be unconstitutional in some circumstances. *Id.* at 3010.

The first part of the *Solem* test focuses on the gravity of the offense compared to the severity of the penalty. In comparing severity of punishment for different crimes, a court should examine the circumstances of a defendant's crime in detail. *Id.* That focus must be on the defendant's personal culpability. *Enmund v. Florida*, 458 U.S. 782, 102 S.Ct. 3368, 3377 (1982), *cited in Solem*, 103 S.Ct. at 3010. We should also consider the harm caused or threatened to the victim or society. *Solem*, 103 S.Ct. at 3011.

The death caused by Cocio's act is indeed a grave consequence. However, his act was reckless, not intentional. It is fundamental that causing harm intentionally must be punished more severely than causing the same harm unintentionally. *Enmund*, 102 S.Ct. at 3377; *see Solem*, 103 S.Ct. at 3011. Defendant's sentence, however, treats him the same as a person con-

victed and sentenced for the intentional act of first-degree murder. *See* A.R.S. § 13–703 (Supp.1984–85). The 25-year minimum penalty imposed under § 13–604.01 for a reckless act seems overly harsh when the same penalty may be imposed for murder. Cocio's sentence, therefore, is not proportional to his *individual* offense.

The second part of the *Solem* analysis requires a comparison of defendant's sentence with others imposed in Arizona. The fact that more serious crimes are subject to the same or lesser penalties is one indication that the punishment at issue may be constitutionally excessive. *Solem*, 103 S.Ct. at 3010. The majority's analysis relies mainly on comparisons of defendants sentenced to life imprisonment under the very statute at issue. (At 283, 709 P.2d at 1342) This comparison is problematic, however, because of the conflict between the statute's overly-broad reach and the individualized nature of the *Solem* inquiry. The analysis also defeats the concept of proportionality because there is no external reference for comparison. The statute is compared to itself. A more appropriate comparison would be made under Arizona's repeat offender statute. *See* A.R.S. § 13–604 (Supp.1984–85). A defendant with a prior felony, convicted of manslaughter, would normally face a sentence of five to fifteen years with a presumptive sentence of seven and one-half years. *Id.* The presumptive sentence may also be rebutted by the trial judge's consideration of mitigating factors in that particular case. *Id.* No such relief is available to defendants sentenced under § 13–604.01 which indiscriminately imposes a mandatory life sentence on *all* offenders who are caught in its web. Thus, this defendant, convicted for a nonin-

tentional act committed at the end of his probation period, is treated more severely than a repeat second-degree murderer.[1] A state is certainly justified in punishing recidivists more severely than first offenders, but the defendant's status should not be considered in the abstract. *Solem*, 103 S.Ct. at 3013. The nature of defendant's prior convictions is relevant to the sentencing decision. *Id.* at n. 21. Section 13–604.01 denies any such consideration. Under the statute, defendant's status as a prior felony offender is viewed in the abstract. The type of prior conviction is not considered. This treatment defeats the very purpose of the *Solem* test which envisions an individualized approach to determining the proportionality of a sentence based on the circumstances of *each case*.

The third prong of the *Solem* test—comparing punishments in other jurisdictions—must be satisfied by analogy because of the unique character of § 13–604.01. The majority relies (At 283–284, 709 P.2d at 1342–1343) on repeat offender statutes in other jurisdictions. The comparison, however, does not support the majority's result. The penalties may be considerably less under the cited statutes because they vest the sentencing judge with discretion not available under our § 13–604.01. For example, a prior felon convicted of manslaughter under Alabama's repeat offender statute would be sentenced under the next higher felony classification. This could result in a sentence from ten to twenty years, with no parole for the time imposed. *See* Ala. Code §§ 13A–5–6 and 15–22–36(e)(1)(c) (1975 and Supp. 1984). In Texas, a similarly situated defendant would also be sentenced under the next higher classification and could get up to twenty years with parole in a minimum of six and two-thirds years. *See* Tex.

---

1. Although § 13–604.01 concerns repeat offenders on probation or parole at the time of the convicted offense, this is an arbitrary basis for imposing a harsher penalty than might be imposed under § 13–604. Under the present scheme, a person previously convicted for second-degree murder who serves the presumptive term and, after his release, is convicted for the same crime, could serve less time than a person

previously convicted for forging a $5 check and then convicted, while on probation, for first-degree burglary involving no injury. A person who commits a more serious crime the day after his parole ends has not necessarily earned a less severe penalty than a person who commits a less serious crime on his last day of probation.

Penal Code Ann. § 12.42 (Vernon 1974) and Tex. Crim. Proc. Code Ann. § 42.12 at § 15(b) (Vernon 1979).

Theoretically, in the jurisdictions cited by the majority as proportional to § 13–604.01, prior felons convicted of manslaughter could, in the discretion of the sentencing judge and parole board, be released in six and two-thirds to ten years. Arizona's statute removes all discretion from the trial judge and eliminates any chance of parole for at least twenty-five years. The penalty imposed by it is not proportional to other jurisdictions and the cited statutes do not support the majority's result.

I would therefore hold that the statute fails to meet the *Solem* test for two reasons. First, because its indiscriminate, broad application allows disproportional sentencing in violation of the eighth amendment. Second, because it does not permit the trial judge to determine the specific sentence by ascertaining and weighing the facts about the crime or the criminal and does not, therefore, permit the necessary proportionality inquiry. The legislature, seeking uniformity of sentencing, has removed individual consideration of the crime or criminal as part of the sentencing process. Howe, *Thoughts on Mandatory Sentencing*, Ariz. Bar J., June-July 1985, at 24, 25.

## THE DISPROPORTIONALITY PERMITTED BY THE STATUTE IS EVIDENCED BY THE FACTS OF THIS CASE

At the trial stage, the jury found Cocio guilty of manslaughter, a felony involving the "use of a dangerous instrumentality" (the car) which in part triggers the application of § 13–604.01. During the sentencing phase, the court instructed the jury that all they had to determine was whether Cocio was on probation or parole from a felony conviction at the time of the offense. The jury found for the state. The statute then required the judge to impose a life sentence without considering any of the individual circumstances. The facts show this to be an unconstitutional application under *Solem*.

Cocio's previous conviction was for first-degree conspiracy. He had received a suspended sentence, was placed on probation for five years and had satisfactorily completed four years and five months of that period when the accident giving rise to the charges occurred. His current conviction was for an unintentional act. These factors, combined with the long interim of what appears to be lawful conduct, tell us something about the nature of the offender and might well militate in favor of a sentence less draconian than life imprisonment with a twenty-five year minimum. However, the statute precluded the trial court from weighing the facts that might have enabled the court to tailor the punishment to the criminal.

The mandatory sentence also precluded the court from obeying *Solem's* teaching to consider the individualized circumstances surrounding the crime committed. True, defendant was convicted of manslaughter, but the culpability of the reckless conduct which is the basis for this conviction (At 280, 709 P.2d at 1339–1340) may vary greatly from case to case. Here too, considerable mitigating evidence existed. The facts shown at trial indicate that both defendant and the other driver, Rodriguez, were legally intoxicated at the time of the accident. It is evident that of the two, Rodriguez was the more culpable in terms of both conduct and causation. The posted speed limit at the scene of the accident was thirty-five miles per hour. Reconstruction experts for both the defendant and the state determined that Rodriguez was driving at least twenty miles per hour over that limit and perhaps even faster. The experts also testified that defendant, evidently driving within the speed limit, attempted a left hand turn at a speed of approximately twenty to twenty-two miles per hour and in making that turn put himself in the path of the approaching Rodriguez vehicle. Even a sober driver might have underestimated his distance from a

speeding vehicle which showed only a single headlight as it approached at night around a curve. Even a sober driver might have misjudged the distance and commenced his left turn, believing it to be safe.

Other evidence also indicated that Rodriguez, not defendant, was quite likely the more culpable of the drivers. Two impartial witnesses testified they saw Rodriguez shortly before the accident, driving well over sixty miles per hour and weaving back and forth on the road. They stated that he almost hit their car as he passed them. All these facts might well prompt a trial judge to find that defendant was less culpable in terms of causation or conduct than the other driver. Under *Solem,* such facts are given substantial consideration in determining the proportionality of a sentence.[2] 103 S.Ct. at 3010. However, all this too becomes irrelevant in face of the mandatory sentence. There are, of course, two sides to the coin. Cocio is not a sterling example of American youth. However, the statute prevents factual inquiry and thus forbids proportion.

The facts of this case illustrate clearly that in a predictable number of cases mandatory sentencing covering a broad range of crimes is simply a form of mandatory injustice. The "use of a dangerous instrumentality" and the "committed while on probation or parole" language of § 13–604.-01 sweep very broadly. Such a statute defies any meaningful proportionality inquiry because it requires the judge to ignore the facts of the infinite number of situations which may be charged under a single criminal statute. It requires him to treat each case and individual defendant alike, insuring that some sentences will fit neither the crime nor the criminal. The legislature may define what is criminal and prescribe the limits of a punishment for particular types of criminal conduct. The legislature may no doubt require mandatory sentencing for very narrow types of criminal violations, such as first-degree murder. But when the majority allows the legislature to usurp the functions of trial judges and to dictate a uniform sentence to be imposed for a wide range of offenses and offenders, no matter what the nature of the act and of the actor, the court surrenders its judicial prerogative and abandons its constitutional duty. I dissent.

---

**2.** The question of comparative culpability provides an interesting and frightening sidelight to the workings of mandatory sentencing laws. Rodriguez, the more culpable of the two actors, made a plea bargain with the state. As part of that agreement, he entered a guilty plea to both manslaughter and DUI. As its part of the bargain, the state dismissed the allegation of "dangerous nature" on the manslaughter charge. Rodriguez was given one years probation on that charge and time served (two days) and a fine on the DUI charge. Cocio claims that the punishment imposed upon Rodriguez, when compared to the life sentence given him, illustrates the lack of proportionality caused by application of the statute. The state rebuts this argument by pointing out that the prosecutor made a similar plea agreement offer to Cocio, who rejected it. In my view, the serious disproportionality in the sentences imposed upon Rodriguez and Cocio is not mitigated by the fact that Cocio chose to make the state prove a very close case at trial. Because this defendant chose to exercise his constitutional right to trial, he faces twenty-four years and three hundred and sixty-three days longer in prison than the more culpable actor. This, too, is a result of the mandatory sentence law. On this subject see generally Gerst, *Guilt or Innocence Not the Issue,* Maricopa Lawyer, Oct. 1985 at 4; Howe, *supra.*